UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LENROY MCLEAN, MILTON SAMUELS,
and ROBERTO SANCHEZ

                              Petitioners,

        -v-

UNITED STATES OF AMERICA,

                              Respondent.

No. 12-cv-1954 (RJS)
No. 12-cv-7362 (RJS)
No. 12-cv-7559 (RJS)

---

UNITED STATES OF AMERICA

        -v-

LENROY MCLEAN, MILTON SAMUELS,
and ROBERTO SANCHEZ,

                              Defendants.

No. 08-cr-789 (RJS)

OPINION AND ORDER

---

RICHARD J. SULLIVAN, District Judge:

Petitioners Lenroy McLean, Milton Samuels, and Roberto Sanchez, all proceeding *pro se*,

bring these petitions for the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2255.

Specifically, McLean challenges his conviction on the ground that he received ineffective

assistance of counsel at trial (No. 12-cv-1954 (RJS), Doc. No. 1 ("McLean Pet.")), Samuels

challenges his conviction and sentence on the ground that he received ineffective assistance of

counsel at trial and at sentencing (No. 12-cv-7362 (RJS), Doc. No. 1 ("Samuels Pet.")), and

Sanchez challenges his sentence on the grounds that he received ineffective assistance of counsel

at sentencing and that the Court improperly sentenced him (No. 12-cv-7559 (RJS), Doc. No. 1

("Sanchez Pet.")). Samuels also moves for the undersigned's recusal. (No. 12-cv-7362 (RJS),

Doc. No. 2.)  For the reasons set forth below, the Court denies Samuels's motion and all three petitions.

## I. Background[1]

### A. Facts[2]

Between early 2007 and 2008, Petitioners participated in a conspiracy to distribute hundreds of kilograms of cocaine through the New York and New Jersey area.  The leaders of the conspiracy were Mauricio Burke, a Panamanian citizen with access to suppliers of cocaine in Panama, and Sanchez, who owned a trucking company named Transfreight Logistics in New Jersey.  (Trial. Tr. 1393:2-5.)  In essence, the conspiracy involved Burke arranging for cocaine to be shipped in containers from Panama to the Port of Newark, with Sanchez using his trucking company to pick up and deliver the cocaine to third parties in the New York and New Jersey area. (*Id.* 1393:6-1394:5.)  Over the course of the conspiracy, the Panamanian suppliers sent over 300

---

[1] Unless otherwise indicated, citations to docketed items refer to those materials that appear on ECF in Samuels's criminal case, *United States v. Samuels*, No. 08-cr-789-6 (RJS) ("Samuels Crim.").  However, the Court also cites to Samuels's civil case, *Samuels v. United States*, No. 12-cv-7362 (RJS) ("Samuels Civ."), McLean's criminal case, *United States v. McLean*, No. 08-cr-789-7 (RJS) ("McLean Crim."), McLean's civil case, *McLean v. United States*, No. 12-cv-1954 (RJS) ("McLean Civ."), Sanchez's criminal case, *United States v. Sanchez*, No. 08-cr-789-1 (RJS) ("Sanchez Crim."), and Sanchez's civil case, *Sanchez v. United States*, No. 12-cv-7559 (RJS) ("Sanchez Civ.").  The Court has also considered Samuels's motion for recusal, Samuels's petition, Samuels's memorandum of law in support of his petition (Samuels Civ., Doc. No. 3 ("Samuels Mem.")), the government's memorandum of law in opposition to Samuels's petition (Samuels Civ., Doc. No. 6 ("Gov't Samuels Opp.")), Samuels's traverse in support of his petition (Samuels Civ., Doc. No. 10 ("Samuels Trav.")), McLean's petition, the government's memorandum of law in opposition to McLean's petition (McLean Civ., Doc. No. 3 ("Gov't McLean Opp.")), McLean's reply memorandum of law in support of his petition (McLean Crim., Doc. No. 260 ("McLean Rep.")), Sanchez's petition, Sanchez's memorandum of law in support of his petition (Sanchez Civ., Doc. No. 9 ("Sanchez Mem.")), the government's memorandum of law in opposition to Sanchez's petition (Sanchez Civ., Doc. No. 11)), Sanchez's reply memorandum of law in support of his petition (Sanchez Civ., Doc. No. 12 ("Sanchez Rep.")), and Sanchez's traverse in support of his petition (Sanchez Civ., Doc. No. 13 ("Sanchez Trav.")), as well as the declarations and exhibits attached thereto.

[2] The facts are drawn from the trial of Samuels and McLean (Doc. Nos. 94, 99, 100, Transcript from Trial of Samuels and McLean ("Trial Tr."), dated March 16-27, 2009), Sanchez's plea hearing (Sanchez Crim., Doc. No. 92, Transcript of Plea Hearing ("Sanchez Plea Tr."), dated March 9, 2009), and Sanchez's *Fatico* hearing (Sanchez Crim., Doc. No. 127, Transcript of *Fatico* Hearing ("Sanchez *Fatico* Tr."), dated July 28, 2009.  The Court draws all factual inferences in favor of the government.  *See Reddy v. Coombe,* 846 F.2d 866, 869 (2d Cir. 1988) (A court "must credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial.").

kilograms to Burke and Sanchez, who arranged for others, including McLean and Samuels, to distribute the drugs in the New York and New Jersey area. (*Id.* 1388:10-12, 1391:21-25.) In addition to acting as the leaders of distribution cells where cocaine was weighed and packaged, Samuels and McLean also provided security, or "muscle," for Sanchez and Burke. (*Id.* 1395:10-13.) Specifically, Samuels participated as armed "backup" in a dispute with Burke's source of supply over a load of cocaine that was seized by law enforcement. (*Id.* 578:21-25, 585:21-23.) Furthermore, Samuels possessed multiple firearms, including numerous handguns and an AK-47 used in connection with the narcotics distribution operation. (*Id.* 1390:21-1391:7.)

## B. Procedural History

On November 5, 2008, a grand jury in the Southern District of New York returned an indictment charging Petitioners with participating in a conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (Doc. No. 40.) On February 18, 2009, the grand jury returned a superseding indictment that added a second count, charging Samuels with using and possessing a firearm in furtherance of the drug conspiracy in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. No. 70.)

On March 9, 2009, Sanchez pleaded guilty to Count One of the Superseding Indictment without a plea agreement. (Sanchez Plea Tr. 35:15-21.) On March 16, 2009, trial commenced on the Superseding Indictment against Samuels and McLean. (*See* Minute Entry for Proceedings, dated March 16, 2009.) On March 27, 2009, after approximately nine days of trial, the jury returned a verdict of guilty against Samuels and McLean on all counts charged – Counts One and Two for Samuels, and Count One for McLean. (Trial Tr. 1646:13-1647:25.)

On July 28, 2009, the Court held a sentencing hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), concerning Sanchez, at which Burke testified as to Sanchez's role

in the conspiracy and Sanchez's knowledge that guns were used in furtherance of the conspiracy. (Sanchez *Fatico* Tr. 13:7-25, 23:2-4.) Thereafter, on September 24, 2009, the Court determined that Sanchez was a leader and organizer of criminal activity involving five or more individuals, pursuant to U.S.S.G. § 2D1.1(b)(1), and that he knowingly used weapons in furtherance of his narcotics activity, pursuant to U.S.S.G. § 3B1.1(a). Based on those findings and the undisputed finding that the conspiracy involved more than 150 kilograms of cocaine, the Court determined that Sanchez's offense level was 41 and his criminal history category was Category I, for a Guidelines range of 324 to 405 months. (Sanchez Crim., Doc. No. 154, Transcript of Sentencing Hearing, dated September 24, 2009 ("Sanchez Sentencing Tr."), 9:16-15:9.) However, because Sanchez had no prior criminal history and, in light of his significant work history and devotion to his family, the Court determined that a sentence of 240 months' imprisonment was sufficient but not more than necessary to meet the objectives of sentencing as set forth in 18 U.S.C. § 3553(a). (*Id.* 49:22-50:7.)

On November 13, 2009, Samuels appeared for sentencing. At that time, the Court determined that Samuels's base offense level was 38 with a two-level enhancement for use of a weapon in furtherance of a conspiracy, a three-level enhancement for his role in the offense, and a two-level enhancement for obstruction of justice based on his perjurious testimony at trial. (Samuels Crim., Doc. No. 176, Transcript of Sentencing Hearing ("Samuels Sentencing Tr."), dated November 13, 2009, 20:19-25-21:1-2.) Accordingly, the Court determined that his total offense level was 45 and his criminal history category was Category I, for a Guidelines range of life. (*Id.* 21:1-2.) Nevertheless, in light of his lack of prior convictions, his difficult upbringing, and his strong family ties, the Court sentenced Samuels to 276 months' imprisonment. (*Id.* 40:5-23.)

On March 10, 2010, McLean appeared for sentencing. At that time, the Court determined that McLean's offense level was 40 – with a base offense level of 38 and a two-level enhancement for use of a weapon in furtherance of a conspiracy – and his criminal history category was Category II, for a Guidelines range of 324 to 405 months. (McLean Crim., Doc. No. 198, Transcript of Sentencing Hearing ("McLean Sentencing Tr."), dated March 10, 2010, 28:7-13.) Nonetheless, in light of Defendant's work history and community ties, and to avoid unwarranted sentencing disparities between McLean and his more culpable co-defendants, the Court sentenced McLean to 228 months' imprisonment. (*Id.* 46:11-47:2.) In addition, the Court ordered that Samuels and McLean forfeit $6,000,000. (Samuels Crim., Doc. No. 175; McLean Crim., Doc. No. 193.)

Each Petitioner filed a notice of appeal, with Sanchez appealing his sentence (Sanchez Crim., Doc. No. 149), Samuels appealing his conviction and sentence (Samuels Crim., Doc. No. 162), and McLean appealing his conviction (McLean Crim., Doc. No. 191). On April 5, 2011, the Second Circuit affirmed the judgment of the Court for each Petitioner. *United States v. Sanchez*, 419 F. App'x 27 (2d Cir. 2011). Specifically, and as relevant here, the Second Circuit rejected Sanchez's arguments that the Court erred when it (1) applied a sentencing enhancement for his leadership role in the conspiracy, (2) applied a sentencing enhancement because of the reasonable foreseeability that a dangerous weapon would be used in furtherance of the conspiracy, and (3) engaged in judicial fact-finding pursuant to the advisory Sentencing Guidelines. *Id.* at 31-33. In addition, the Second Circuit found that the evidence adduced at trial was sufficient to support the convictions of McLean and Samuels, and in doing so, rejected McLean's attack on the cell site evidence used at his trial. *Id.* at 30. The Second Circuit also rejected Samuels's arguments that his forfeiture judgment was unfair or improper. *Id.* at 33.

Each Petitioner subsequently filed a petition for a writ of habeas corpus, with each arguing that he received ineffective assistance of counsel. In addition, Samuels has asked for the undersigned's recusal on the grounds that the undersigned is biased against Jamaicans and was formerly a prosecutor for the Southern District of New York United States Attorney's Office. (Samuels Civ., Doc. No. 2.) Finally, Sanchez also argues that the Court improperly sentenced him under the Sentencing Guidelines. (Sanchez Pet.)

## II. LEGAL STANDARD

Section 2255 enables a prisoner who was sentenced by a federal court to petition that court to vacate, set aside, or correct the sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief under Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted). A claim of ineffective assistance of counsel, however, is one permissible basis for bringing a Section 2255 petition.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to the assistance of counsel. U.S. Const. amend. VI. When challenging the effectiveness of counsel's assistance, a party must demonstrate that (1) counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and

(2) this "deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). A court must reject a petitioner's ineffective assistance of counsel claim if it fails to meet either prong. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013).

With respect to *Strickland*'s first prong, a court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). The court starts from the strong presumption that counsel's conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009) (citing *Strickland*, 466 U.S. at 690-91). Because there are many different ways to provide effective assistance in any given case, and "[e]ven the best criminal defense attorneys would not defend a particular client the same way," there is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 689-690.

With respect to *Strickland*'s second prong, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 691). Rather, to find prejudice, a court must conclude that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* (quoting *Strickland*, 466 U.S. at 686). In other words, a

"reasonable probability" that the outcome would have been different but for counsel's deficient performance is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In the guilty plea context, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In addition, a petitioner may show prejudice by demonstrating that he would have received and accepted a guilty plea with a lower sentence but for counsel's errors. *See Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012); *see also Lafler v. Cooper*, 132 S. Ct. 1376, 1391 (2012) (finding prejudice where the defendant showed that, but for counsel's deficient performance, there was a reasonable probability that the court would have accepted a guilty plea with a sentence less than a third of the length of the sentence he received after trial). Thus, with respect to plea bargaining, a defendant must show that "the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384. And as a general rule, "defense counsel has the duty to communicate formal [plea] offers from the prosecution." *Frye*, 132 S. Ct. at 1408 (finding prejudice where a defendant's counsel allowed a favorable plea offer to expire without advising the defendant that the offer had been made).

## III. DISCUSSION

### A. McLean Petition

As noted above, McLean alleges that his trial counsel[3] rendered ineffective assistance by failing to (1) challenge evidence offered by the government with respect to McLean's use of

---

[3] Curiously, McLean misidentifies his trial attorney as Scott Tulman. In fact, on December 12, 2008, Scott Tulman, Esq., was relieved as counsel of record in favor of Jason Russo, Esq. (McLean Crim., Doc. No. 49.) Trial commenced on March 16, 2009, and concluded on March 27, 2009. Thereafter, on June 9, 2009, Russo was relieved as counsel of record in favor of David Touger, Esq. (McLean Crim., Doc. No. 106.)

cellular telephone towers in New Jersey, near Sanchez's truck yard, (2) adequately prepare for trial, (3) discuss the option to plead guilty, (4) allow McLean to testify at trial, and (5) investigate an alibi.  For the reasons set forth below, the Court rejects each of McLean's arguments.

### 1. Failure to Challenge Cell Tower Evidence

McLean claims his trial counsel was ineffective because he "did not challenge the Government's evidence concerning alleged calls recorded at various cell phone towers near case locations." (McLean Pet. at 24.)[4]  Specifically, McLean argues that had his counsel analyzed the times of the calls and the distances between the cell towers associated with those calls, he would have been able to demonstrate that McLean did not make the phone calls that the government ascribed to him.  (*Id.* at 24-25.)  The Court disagrees, and finds that McLean has failed to meet either prong of the *Strickland* test with respect to this argument.

First, McLean has failed to demonstrate that counsel's actions fell below an "objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  To the contrary, the record reflects that McLean's trial counsel subjected the government's cell phone tower witness to thorough cross-examination, which belies the argument that his counsel did not analyze or challenge the government's cell tower evidence.  (*See, e.g.*, Trial Tr. at 1093:22-24, 1094:2-5, 1095:22-24.) Indeed, on cross-examination, the government's witness on the cell tower evidence admitted that, in certain areas, calls could hit cell towers miles away (*see id.* 1094:7-22), that he had not personally checked any of the numbers in the cell records (*id.* 1095:20-21), and that he was not aware of any other numbers on the charts connected to members of the conspiracy (*id.* 1096:12-

---

[4] McLean also raises these arguments in two additional motions, filed on September 23, 2015 (McLean Crim., Doc. No. 323) and March 16, 2016 (McLean Crim., Doc. No. 338).  In the September 23, 2015 filing, McLean argues that his counsel was ineffective for failing to obtain additional cell site records, for failing to object to their introduction, and for allowing the records to enter on stipulation.  (McLean Crim., Doc. No. 323.)  The Court addresses all of these arguments in this section.

16).  Counsel also adequately challenged phone calls attributed to McLean.  (*Id.* at 1005:4-6 ("So if Mr. McLean was in custody at 5:04 p.m., at least in your practice as a Bayonne police officer, your knowledge, he shouldn't have had access to his cell phone?").)  In sum, it is difficult to see what else Russo or any lawyer could have done to neutralize the cell tower evidence, which was used not to isolate with precision McLean's position at any particular time, but rather to corroborate the government's cooperating witness, Burke, who described various meetings on certain dates with McLean at approximate times in New Jersey.  McLean simply has not shown that his counsel's decisions with respect to the cell site records were anything other than strategic choices, which the Court will not second-guess.  *See Mayo*, 13 F.3d at 533.

McLean also fails to demonstrate prejudice.  Without explanation, McLean in his petition simply lists a string of calls that he asserts "could not physically have been made," but he fails to demonstrate how that was so or articulate how he was prejudiced beyond a single conclusory sentence: "Appellant was prejudiced."  (McLean Pet. at 25.)  Significantly, the Second Circuit, in rejecting McLean's argument that there was insufficient evidence to support his conviction, held that the testimony of Burke alone constituted more than enough evidence for McLean's conviction, and that the cell phone tower evidence merely served to corroborate Burke's testimony.  *Sanchez*, 419 F. App'x at 30.  The Court agrees.

### 2.  Failure to Adequately Prepare

McLean next argues that there was "no trial preparation by counsel, no motions filed, and counsel simply flew by the seat of his pants."  (McLean Pet. at 26.)  He further states that counsel visited McLean only once prior to trial for five minutes.  (*Id.*)  Once again, McLean has failed to demonstrate either prong of the *Strickland* standard.

As an initial matter, McLean's trial attorney, Mr. Russo, staunchly denies McLean's allegations, averring that he "spent numerous hours preparing both before and during the trial," that he and his partner "visited with Mr. McLean jointly and individually," and that "after the jury's verdict was announced, [he] recall[s] Mr. McLean hugging [him] and thanking [him] for all [his] hard work and effort on [Mr. McLean's] behalf." (McLean Civ., Doc. No. 3, Ex. A, Declaration of Jason Russo, dated May 4, 2012 ("Russo Decl."), ¶¶ 2, 4.)

But even without resolving the factual dispute between McLean and Russo as to the number of attorney-client visits made before trial, the Court observed, and the trial transcripts corroborate, that Russo was prepared, cross-examined witnesses effectively, and presented clear and strong addresses to the jury. For example, counsel argued that the sole recorded phone call between Burke and Sanchez about McLean was really about McLean selling cars, and for support, he invited the jury to go through McLean's phone records to see how many contacts he had for "auto part stores, junk yards, auto auctions, car dealerships, insurance agents." (Trial Tr. at 1482:16-1483:16.) Counsel also effectively cross-examined Burke on his background and motivation (*id.* at 760-64), how testifying would reduce Burke's long prison sentence (*id.* at 765-66), Burke's long criminal history (*id.* at 776-68), and his limited interaction with McLean (*id.* at 791–95). And in summation, counsel highlighted the lack of physical evidence implicating McLean. (*Id.* at 1471:18-22 ("Where are his cell site records showing that, hey, there's [McLean] and [Samuels] together in Newark on the day that Burke talked about – he never gave specific dates but whatever. That's not there. I submit to you it is not there because they don't have it.").) The record shows that counsel's preparation and investigation into the facts were more than adequate and do not rise to the level of constitutional inadequacy. *See Strickland*, 466 U.S. at 680,

691 (emphasizing that counsel's investigation need not be exhaustive and that heavy deference will be accorded to strategic choices).

In any event, McLean does not explain how the alleged lack of preparation prejudiced him at trial. His conclusory assertion that "but for counsel's unprofessional errors, the result of the trial would have been different" (McLean Pet. at 27) is clearly insufficient to demonstrate actual prejudice. As the Second Circuit recognized previously, the evidence at trial was more than enough to support McLean's conviction, since the government corroborated Burke's testimony with the nearly 300 kilograms of cocaine seized, wiretaps, testimony from government agents, and the cell site evidence discussed above. In light of the overwhelming evidence of McLean's guilt that the government introduced at trial, McLean cannot demonstrate that he was prejudiced by his counsel's alleged lack of preparation.

### 3. Failure to Discuss Option to Plead Guilty

McLean asserts that he was forced to go to trial by his counsel and that counsel "never even discussed the option of a guilty plea with appellant prior to trial." (McLean Pet. at 26.) McLean's trial counsel again disputes this contention, stating that "[t]he prospect of a guilty plea was discussed" but "Mr. McLean did not express any interest in pursuing a plea as he continually professed his innocence." (Russo Decl. ¶ 4.)

Once again, the Court need not resolve this factual dispute, since McLean has not satisfied the second *Strickland* prong. To establish prejudice, McLean "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have

been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 132 S. Ct. at 1385. McLean has not offered any facts or evidence to suggest that a plea deal was ever offered by the government, nor has McLean even asserted that he would have pleaded guilty if given the opportunity. Therefore, McLean cannot make out an ineffective assistance of counsel claim based on his counsel's alleged failure to discuss the option to plead guilty.

### 4. Failure to Permit McLean Testify

McLean next claims he always planned on testifying and that counsel told him he could not do so. (McLean Pet. at 26.) The right to testify is "personal" to a defendant and can be waived only by him. *See Chang v. United States,* 250 F.3d 79, 82 (2d Cir.2001) (citing *Brown v. Artuz,* 124 F.3d 73, 77 (2d Cir. 1997)). Defense attorneys therefore have the obligation "to inform their clients of that right and to ensure that clients understand that the ultimate decision belongs to them, not counsel." *Id.* at 83. Like other ineffective assistance claims, a claim that defense counsel prevented a defendant from testifying can succeed only if both prongs of the *Strickland* test are met. *See Brown*, 124 F.3d at 74 (holding that the *Strickland* two-part test governs claims that defense counsel failed to advise of the right to testify, and finding that the petitioner had failed to satisfy the prejudice prong); *Bennett v. United States*, 663 F.3d 71, 84-85 (2d Cir. 2011) (same); *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001) (same). Here, McLean has failed to meet either requirement.

McLean has not provided any evidence, nor does the record indicate, that counsel denied McLean's requests to testify. As an initial matter, trial counsel flatly contradicts McLean's assertion, noting that "[a]lthough Mr. McLean and [he] discussed [McLean's] right to testify, [McLean] never indicated any desire to take the witness stand." (Gov't McLean Opp., Ex. A at 1.) Indeed, when trial counsel informed the Court, outside the presence of the jury, that he did not

intend to put on a defense case, McLean never mentioned his desire to testify. (Trial Tr. 1073:24-25.) Even after his co-defendant, Samuels, testified, McLean did not indicate any desire to testify. In short, McLean has offered no support for his bare assertion that he wanted to testify but trial counsel prevented him from doing so.

Furthermore, McLean has not demonstrated that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Chang*, 250 F.3d at 84. In his reply brief, McLean asserts that had he been permitted to testify, he would have testified that (1) he was not guilty, (2) the sole conversation the government recorded of him was about automobiles, not narcotics, (3) McLean was at an insurance auto auction on the day Burke testified he saw McLean with cocaine, and (4) Burke was a liar. (McLean Rep. at 1-2.) However, not only was the government's evidence of McLean's guilt overwhelming, but McLean's counsel *did* argue during summation that (1) McLean was not guilty, (2) the recorded conversation was about automobiles, (3) McLean was involved with insurance auto auctions, and (4) Burke was lying. (Trial Tr. 1481:21-1483:19.) McLean has not demonstrated how his ability to testify at trial would have made any difference in light of the fact that his counsel made the very same arguments, nor does McLean confront the obvious risk that in testifying he would have opened himself to cross-examination from the government. Therefore, McLean cannot show that there is a "reasonable probability" that had he testified the outcome of the trial would have been any different.

### 5. Failure to Investigate Alibi

McLean also claims that his counsel was ineffective for failing to investigate his purported alibi. Specifically, McLean asserts that he was at an auto auction on May 5, 2008, and therefore Burke could not have seen him and Samuels receiving cocaine from Sanchez, as Burke testified.

McLean claims that business records from the auto auction would indicate that his ID card was scanned at the auction, and that it was therefore objectively unreasonable for trial counsel to never attempt to obtain the insurance auto auction's records to prove McLean's alibi. (McLean Rep. at 2.)

Once again, McLean has not provided any evidence of insurance records or any evidence that he communicated this information to trial counsel. McLean concedes that "[t]he [auction] records are not now available," but insists that they "were likely available at the time of trial." (*Id.*) Clearly, such bare assertions – made years after trial – are not enough to support a finding of ineffectiveness. Nor has McLean demonstrated how the record of one auto auction, that would purportedly establish his whereabouts on a single day, could overcome the evidence of his involvement in a drug trafficking conspiracy that spanned many months. *See, e.g.*, *Jackson v. Lee*, 2010 WL 4628013, at *41 (S.D.N.Y. Nov. 16, 2010) (rejecting a habeas claim for ineffective assistance of counsel when the purported alibi would only cover one of several criminal acts). Since McLean has the burden of proving that the failure to investigate and develop an alibi would have affected the outcome at trial, McLean's conclusory remark – "Of course I was prejudiced by counsel's ineffective assistance. I was convicted." (McLean Rep. at 2) – is insufficient to demonstrate actual prejudice. Accordingly, the Court finds that McLean cannot demonstrate prejudice and denies McLean's ineffective assistance of counsel claim.

### 6. Motions to Expand the Record

Finally, in two separate motions, McLean asks the Court to require the government "to specifically delineate all instances of electronic interception" pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings and to expand the record pursuant to Rule 7. (McLean Crim., Doc. Nos. 323, 338.)

The Court denies McLean's first request that the government be required to produce additional discovery on electronic interception. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Pizzuti v. United States*, 809 F. Supp. 2d 164, 175 (S.D.N.Y. 2011). Rather, the Second Circuit has noted that "Rule 6(a) of the Rules Governing Section 2255 Proceedings . . . provides that a [Section] 2255 petitioner is entitled to undertake discovery only when the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." *Lewal v. United States,* 152 F.3d 919, 1998 WL 425877 at *2 (2d Cir. June 9, 1998) (summary order) (internal quotation marks omitted). Here, McLean has not offered any justification or facts to show good cause for his request. Accordingly, the Court declines to order any additional discovery from the government.

The Court also denies McLean's request to expand the record pursuant to Rule 7 of the Rules Governing Section 2255. Rule 7(a) provides, "[i]f the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion." Under Rule 8(a), "[i]f the [Section 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." A petitioner is not entitled to a hearing, however, if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). *See United States v. Malcolm*, 432 F.2d 809, 812 (2d Cir. 1970) (a hearing is not required "where the allegations are insufficient in law, undisputed, immaterial, vague, palpably false or patently frivolous"). Here, given the Court's conclusion that the petition must be dismissed in its entirety, McLean is not entitled to an evidentiary hearing or to any expansion of the record. *See Martin v. United States*, 834 F. Supp. 2d 115, 139 (E.D.N.Y. 2011).

B.  Samuels Petition

As an initial matter, Samuels seeks the Court's recusal from deciding the instant petition, arguing that the undersigned "has demonstrated that he has a bias and/or prejudice toward Jamaicans," and that the undersigned "was a former AUSA for the Southern District of New York from 1994-2005."  (Samuels Civ., Doc. No. 2 at 2.)  Due to these two factors, Samuels "is convinced that he will not receive proper unbiased consideration of his post-conviction claims and allegations to which he is entitled."  (*Id.*)

Pursuant to 28 U.S.C. § 455(a), a judge must recuse himself in "any proceeding in which his impartiality might be reasonably questioned."  Section 455(b)(1) requires recusal where the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts."  The Second Circuit, however, has instructed that when "the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited."  *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001).  "[A] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is."  *Id.* (internal quotation marks omitted).

In this case, Samuels is correct that the undersigned served as an Assistant United States Attorney for the Southern District of New York from 1994 until 2005.  Samuels, however, has not articulated any bias or prejudice on the part of the undersigned – indeed, there is none – with respect to this case.  Rather, Samuels has only speculated about any bias or prejudice due to the undersigned's prior position as an Assistant United States Attorney and has only proffered unsubstantiated assertions about the undersigned's views of individuals of a given nationality.  *See, e.g.*, *United States v. Oluwafemi*, 883 F. Supp. 885, 893 (E.D.N.Y. 1995) (denying motion for recusal and holding that a judge who was formerly a federal prosecutor can preside over cases

involving former colleagues who are still prosecutors); *Hall v. Dworkin*, 829 F. Supp. 1403, 1408 (N.D.N.Y. 1993) (unsubstantiated accusations of racial bias are insufficient to warrant recusal); *cf. United States v. Colon*, 961 F.2d 41, 44 (2d Cir. 1992) (noting that "personal bias means prejudice based on 'extrajudicial' matters, and earlier adverse rulings, without more, do not provide a reasonable basis for questioning a judge's impartiality). Accordingly, Samuels's motion for recusal is denied. *See Barnett v. United States*, No. 11-cv-2736 (LAP), 2012 WL 1003594, at *2 (S.D.N.Y. Mar. 26, 2012) (denying motion for recusal when habeas petitioner raised "the sort of 'unfounded innuendo' that does not form a basis for mandatory recusal under Section 455(a)").

As for Samuels's habeas petition, he contends that his trial counsel was constitutionally ineffective for failing to: (1) move pretrial for dismissal of the indictment under the Speedy Trial Act, (2) negotiate a disposition before trial, (3) provide conflict-free representation, (4) litigate the trial effectively, (5) identify and challenge prosecutorial misconduct, (6) move for a *Fatico* hearing with regard to disputed sentencing issues, (7) properly challenge forfeiture, (8) challenge the imposed life term of supervised release, and (9) assist in the return of certain personal property or turn over case materials. The Court will address each in turn.

### 1. Speedy Trial Act

Samuels asserts that, had his attorney not made numerous filing errors that resulted in continuances, "the government would have failed to get Mr. Samuels to trial within the [Speedy Trial] Act's 70 day window." (Samuels Mem. at 8.) Specifically, Samuels seems to refer to a number of error messages that appear on the ECF docket. (Samuels Crim., Doc. Nos. 55-63.) As a result of these deficient entries, Samuels contends that he received constitutionally ineffective counsel. These deficient filings, however, were made between February 5, 2009 and February 9, 2009 and appear to be ECF filing errors that were resolved by February 11, 2009. More

importantly, these filing errors had no effect on the trial schedule that had been previously set at a conference on January 23, 2009. (*See* Minute Entry for Proceedings, dated January 23, 2009.) At that conference, the Court ordered that time be excluded pursuant to 18 U.S.C. § 3161(h)(7)(A) in the interests of justice and scheduled the trial for March 16, 2009. The trial commenced, as scheduled, on March 16, 2009 and the deficient docket entries had absolutely no effect on the timing of Samuels's trial. (*See* Minute Entry for Proceedings, dated March 16, 2009.) Rather, any delay in the case beyond the 70-day Speedy Trial Act window was the result of the Court ordering that time be excluded in order to allow Samuels time to review discovery and prepare a defense. (*See, e.g.*, Minute Entries dated November 6, 2008, December 12, 2008.) In sum, Samuels has not demonstrated that there was a reasonable probability that, but for the filing errors, the result of the trial, or even its timing, would have been different. Thus, the second *Strickland* prong is not met.

### 2. Failure to Negotiate a Plea Bargain

Samuels also argues that his attorney failed "to inquire into and negotiate a favorable plea agreement on his behalf." (Samuels Mem. at 9.) In order to successfully make this argument:

> [A] defendant must show but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court . . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 132 S. Ct. at 1385. To satisfy this first element under *Lafler*, that "there is a reasonable probability that the plea offer would have been presented to the court," Samuels must demonstrate that the government offered him a plea deal or would have offered him a deal and that he would have accepted it. *See Burger v. Kemp*, 483 U.S. 776, 785-86 (1987) (holding that the failure of a lawyer to obtain a favorable plea bargain is not ineffective assistance of counsel "where there is no evidence such a plea deal would have been offered"). Here, Samuels has not alleged any facts

to show he was ever offered a plea deal or that the government would have offered him such a deal, let alone that he would have accepted it. *See Anthoulis v. New York*, 586 F. App'x 790, 792 (2d Cir. 2014) (finding no prejudice where petitioner's theory that he could have gotten a more favorable plea agreement was "based on mere speculation about how plea negotiations would have proceeded"); *see also Millington v. Lee*, No. 11-cv-499 (LGS) (DCF), 2015 WL 1402133, at *13-15 (S.D.N.Y. Mar. 26, 2015) (noting that "speculation" is insufficient to show prejudice). Because Samuels's mere speculation that he might have received a better plea deal is insufficient to show ineffective assistance of counsel, this claim is also rejected.

### 3. Conflict of Interest

Samuels next argues that one of his attorneys "was conflicted by apparent unknown duties or obligations to other clients or simply his lack of commitment to Samuel's defense." (Samuels Mem. at 13.) Samuels bases this claim on the allegation that his counsel failed "to inform Samuels at each critical stage of the proceedings, discuss strategy and develop a defense." (*Id.* at 13-14.) Unlike other categories of ineffective assistance, conflict of interest claims are not necessarily subject to *Strickland*'s stringent prejudice requirement. Instead, prejudice is presumed where counsel is shown to have had an "actual conflict of interest." *Strickland*, 466 U.S. at 692 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980)). However, to establish an actual conflict of interest, a defendant must show that "the attorney's and defendant's interests diverge[d] with respect to a material factual or legal issue or to a course of action." *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993) (internal quotation marks omitted); *see also United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000). Moreover, it is well settled that the mere "possibility of a conflict," without more, "is insufficient to impugn a criminal conviction." *Sullivan*, 446 U.S. at 350.

With respect to any alleged "conflict of interest," Samuels has brought forth no evidence of an actual conflict, nor has he identified any potential conflict. In fact, Samuels' own submission describes the conflicts as "unknown" (Samuels Mem. at 13), and claims that counsel's alleged failure to keep him apprised of the defense strategy evidences the existence of a conflict of interest. Because Samuels has shown no actual conflict of interest, he must satisfy *Strickland*'s more demanding standard for ineffective assistance. *See id.* ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").

Assessing Samuels's argument under the traditional *Strickland* test, it is clear that Samuels has failed to meet either prong. First, Samuels' bald assertion that his counsel failed to develop a defense is contradicted by the record. For instance, Samuels's counsel made numerous successful objections during the government's direct examination of Special Agent Carrera. (Trial Tr. 58-144.) During the testimony of Mauricio Burke, the government's primary cooperating witness, Samuels's counsel asked meaningful and impeaching questions regarding Burke's prior criminal history and the fact that cooperation was his only means of reducing an impending lengthy prison sentence. (*Id.* 668-759.) Finally, during summation, Samuels's counsel identified various potential shortcomings in the government's case as he vehemently questioned the credibility of Burke and the sufficiency of the government's evidence. Thus, Samuels' has not shown that counsel fell below an objective standard of reasonableness, and his vague assertion of a conflict of interest is insufficient. Second, Samuels has also not shown prejudice because he has made no effort to demonstrate that there is a reasonable probability that the outcome of the trial would have been different but for counsel's "unknown duties or obligations." In light of the fact that Samuels has failed to meet either *Strickland* prong, this claim also fails.

### 4. Denial of Counsel

Samuels next claims that he suffered a "complete denial of counsel" that should result in "a presumption of prejudice." Samuels is correct that denial of counsel is legally presumed to result in prejudice, *Strickland*, 466 U.S. at 691, but in his brief and affidavit, he simply alleges that his counsel made unwise choices, so that "his trial attorney essentially abandoned him at critical stages of the prosecution." (Samuels Mem. at 16.) Samuels's argument, in actuality, is not about the denial of counsel but about the claimed ineffectiveness of counsel. In essence, Samuels is retroactively criticizing his counsel's strategic choices. But as noted above, the record demonstrates that Samuels's counsel delivered an opening statement (Trial Tr. 40-42), a summation (*id.* 1434-59), made objections (*see, e.g.*, *id.* 108-44), introduced evidence (*see, e.g.*, *id.* 1199), and called witnesses – including Samuels himself – as part of the defense case (*see, e.g.*, *id.* 1189-1204). Put simply, Samuels's counsel's actions do not remotely amount to the sort of "abandonment" that would entitle Samuels's claim to a presumption of prejudice. *See, e.g.*, *Rivas v. Fischer*, 687 F.3d 514, 539 (2d Cir. 2012) (noting that abandonment could be found if attorney "ignored or contravened [the defendant's] express instructions"); *Abbamonte v. United States*, 7 F. App'x 58 (2d Cir. 2001) ("[T]rial counsel's abandonment of [the defendant] at sentencing amounted to a complete denial of counsel during a critical stage of the proceeding.") Accordingly, this argument likewise fails to satisfy either *Strickland* prong.

### 5. Prosecutorial Misconduct

Samuels argues that his attorney failed to properly challenge several instances of prosecutorial misconduct at trial. (Samuels Mem. at 13.) Specifically, Samuels conclusorily asserts that the government knowingly introduced perjurious testimony from the cooperating witnesses, Burke and Calcano, and that defense counsel failed to object. (*Id.* at 18.) In order to

prevail on a claim of prosecutorial misconduct, Samuels must show that the prosecution knew or should have known false testimony was introduced and that there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006). There are no facts to suggest that this is the case here. The fact that Samuels's testimony contradicted that of the cooperators is not enough to establish that the cooperators' testimony was perjurious. To the contrary, the jury clearly credited the cooperating witnesses, and, by necessary implication, rejected Samuels's contradictory testimony. The Court concurred with the jury's verdict and concluded that Samuels's testimony was perjurious, thereby warranting a two-level sentencing enhancement for obstruction of justice. (Samuels Sentencing Tr. 20:19-21:2.) Therefore, the first *Strickland* prong has not been met, since Samuels's counsel cannot be considered ineffective for failing to object to testimony that Samuels has not shown to be false. Additionally, even if these meritless objections had been raised, there is not a reasonable probability that the outcome of the trial would have been different, since the Court would have summarily overruled the objections. *See United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) (noting that "[f]ailure to make a meritless argument does not amount to ineffective assistance"). Accordingly, the second *Strickland* prong likewise has not been met.

### 6. Failure to Request a *Fatico* Hearing

Samuels next claims that his attorney was ineffective for failing to request a *Fatico* hearing on issues related to the number of kilograms of cocaine involved and the value of the cocaine, which were relevant to the Court's forfeiture order. (Samuels Mem. 20-21.) However, the Court is permitted to rely on the trial record to resolve any disputed sentencing issues. *See United States v. Munoz*, 268 F. App'x 36, 48-49 (2d Cir. 2008) ("Based on the evidence presented at trial, [the judge] fairly surmised [defendant] conspired to distribute at least 15 kilograms of cocaine. The

trial testimony of drug dealers to whom [defendant] sold cocaine provided a sufficient basis for that finding."). Here, the Court relied on the trial record to find that, conservatively, 300 kilograms of cocaine were transferred and distributed as a result of the conspiracy. (Trial Tr. 1388:10-12, 1391:21-25.) Additionally, the Court properly relied on the trial record to find gross profits of $20,000 per kilogram, justifying a $6 million forfeiture. (*Id.* 906:12-24.) In the face of such evidence, the decision not to request a *Fatico* hearing was a reasonable strategic decision, particularly since the Court would not have granted such a request in light of the fact that the Court had already presided over a nine-day trial. Additionally, Samuels has failed to explain how the Guidelines calculation or forfeiture order would have been different had his counsel requested and received permission to challenge these factual questions at a *Fatico* hearing. Thus, this claim necessarily fails the second *Strickland* prong, since, even if there had been a *Fatico* hearing, the outcome would have been the same.

### 7. Forfeiture

Samuels similarly claims that his attorney was ineffective for failing to challenge the Court's forfeiture determination. (Samuels Mem. 23.) However, Samuels once again simply makes a bare assertion, failing to specify on what grounds his attorney should have challenged the forfeiture, how his counsel's failure to raise these grounds was ineffective, or how Samuels was prejudiced by his counsel's failure to raise them. More to the point, the Second Circuit has already denied Samuels's claim that the forfeiture was improper, *United States v. Sanchez*, 419 F. App'x 27, 33 (2d Cir. 2011), thereby defeating his claim of ineffective assistance on this point. *See Yick Man Mui*, 614 F.3d at 53 (noting that the "mandate rule bars re-litigation of issues already decided on direct appeal").

### 8. Supervised Release

Samuels also argues that his counsel was ineffective because he failed to challenge the Court's imposition of a life term of supervised release. This term, however, is statutorily permissible under 21 U.S.C. § 841(b)(1)(A). In this case, under the United States Sentencing Guidelines, Samuels would have received a life term of imprisonment, but the Court determined that a below-Guidelines sentence of 276 months, followed by a life term of supervised release, would be more appropriate. Samuels has not articulated the arguments that his counsel *could* have made to oppose the imposition of a maximum term of supervised release, nor has he explained how he was prejudiced by his counsel's failure to make those arguments. As the judge responsible for the sentencing, the Court is unaware of *any* facts or arguments that counsel could have raised that would have altered the Court's determination that a life term of supervised release following a below-Guidelines range of imprisonment was appropriate. This is particularly true given the extensiveness of the narcotics conspiracy and Samuels's use of firearms in furtherance of the conspiracy. Therefore, this claim fails to satisfy either of the *Strickland* prongs.

### 9. Return of Property

Finally, Samuels contends that the government has improperly failed to return the personal property seized during his arrest and subsequent investigation. (Samuels Mem. 25-26.) Specifically, Samuels claims that Drug Enforcement Agency agents seized credit cards, keys, and $8,000 in cash from him when he was arrested, and later, incident to the search of two other properties, seized his passport, personal documents, and jewelry. (*Id.* at 25.) He claims that despite his repeated requests, his counsel improperly failed to seek the return of the property, and that the property has not been returned. (*Id.* at 25-26.) On this basis, Samuels asks the Court to find that his counsel was ineffective and "seeks the immediate return of his personal property." (*Id.* at 26).

However, the Court may not review the earlier disposition of Samuels's motion for the return of his property, or order the return of the property, in the context of a collateral attack under Section 2255. Put simply, a petitioner may not challenge a noncustodial aspect of his sentence under Section 2255, even if, in the same motion, he also properly challenges his custodial punishment. *Kaminski v. United States*, 339 F.3d 84, 89 (2d Cir. 2003) ("Habeas lies to allow attacks on wrongful custodies. There is therefore no reason why the presence of a plausible claim against a custodial punishment should make a noncustodial punishment more amenable to collateral review than it otherwise might be."). Thus, Samuels cannot challenge the Court's disposition of his motion to return the property here.

## C. Sanchez Petition

Sanchez raises three claims in his petition: first, he argues the Court erred in applying weapon and leadership role enhancements under the Sentencing Guidelines; second, he contends the Court engaged in improper fact-finding in determining the drug quantity for which Sanchez was liable; and third, he maintains that his counsel was constitutionally ineffective for failing to find and introduce videotapes that would have undermined Burke's testimony. The Court considers and rejects each claim in turn.

### 1. Sentencing Enhancements

Sanchez asserts that the Court "relied on impermissible factors in holding [him] accountable for organizer/leader enhancement and weapons enhancement." (Sanchez Pet. at 1.) Specifically, Sanchez argues that he never admitted that he was a leader or an organizer, or that he or a co-defendant ever possessed a gun, and that the Court relied on Burke's testimony in concluding that the weapon and leader enhancements applied. (Sanchez Mem. at 2.)

As an initial matter, Sanchez's sentencing enhancement claims are procedurally barred. The "mandate rule bars re-litigation of issues already decided on direct appeal," which includes not just "matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui*, 614 F.3d at 53. Here, the Second Circuit already rejected Sanchez's arguments that the Court erred when it applied sentencing enhancements for his leadership role in the conspiracy and for it being reasonably foreseeable that a dangerous weapon would be used in furtherance of the conspiracy. *Sanchez*, 419 F. App'x at 31-32. Therefore, it is clear that Sanchez is procedurally barred from arguing yet again that the Court improperly applied the leadership and weapon enhancements in calculating his Sentencing Guidelines range.

In addition to being procedurally barred, Sanchez's arguments regarding his sentencing enhancements are also contradicted by the evidence. In deciding whether to apply a sentencing enhancement under the Sentencing Guidelines, "disputed facts . . . need be established only by a preponderance of the evidence." *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992). Here, Burke's testimony at Samuels and McLean's trial and Sanchez's *Fatico* hearing clearly established that Sanchez had a leadership role in the conspiracy and that it was foreseeable that members of the conspiracy would and did possess firearms.

According to Burke's testimony, Sanchez used his "trucking company," including its employees, and his knowledge "about the shipping industry," to "provide safe retrieval of the containers" full of cocaine. (Sanchez *Fatico* Tr. 10:4; Trial Tr. 493:8.) Sanchez oversaw, and was directly responsible for, the transportation and unloading of the cocaine. (Trial Tr. 501:7-20.) The conspirators used Sanchez's company's trucks to transport the cocaine, Sanchez's yard to unload it, and Sanchez's office to discuss the criminal activity, all with his approval. (*Id.* at 493:7-17,

501:13-14, 577:4-9.)  Sanchez actively recruited Samuels and McLean, among others, whose inclusion in the conspiracy he facilitated and whose activity he oversaw.  (*Id.* at 510:8-512:15, 551:8-9.)  Indeed, Burke testified that Sanchez would describe Samuels as his "muscle."  (*Id.* 557:12-558:4.)  Moreover, Sanchez and Burke made important decisions together and split the profits of the conspiracy.  (*Id.* at 549:8-11, 573:18-20.)  Sanchez planned, coordinated, and implemented much of the conspiracy.  The Court found Burke to be a credible witness, and as the Second Circuit recognized in denying Sanchez's direct appeal, the jury did not err in doing the same.  *Sanchez*, 419 F. App'x at 30.  Thus, the Court's finding that Sanchez was a leader was amply supported by the evidence, which clearly demonstrated that he "played a crucial role in the planning, coordination, and implementation of a criminal scheme."  *United States v. Paccione,* 202 F.3d 622, 624 (2d Cir. 2000).

Sanchez also argues that the Court could only apply the four-level leadership enhancement if Sanchez exercised control over five or more participants.  (Sanchez Pet. at 4.)  In particular, Sanchez asserts that he did not control his wife, Gabrielle Cohen-Sanchez, or his brother-in-law, Joseph Rivera.  (*Id.*)  Sanchez misinterprets the Guidelines.  A defendant "may qualify for the [leadership role] enhancement if he organized or led at least one other participant," "so long as the criminal activity had five or more participants."  *United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000); *see also United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995).  A "participant for the purposes of an offense-role enhancement is someone who is criminally responsible for the commission of the offense, but that person need not have been convicted."  *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003).  Moreover, the Second Circuit has also held that "in calculating whether there are five participants, the defendant may properly be included as one of the five."  *Id.* (citing *Paccione*, 202 F.3d at 625).  Here, the Court found that, at a minimum,

(1) Sanchez supervised both Samuels and McLean, and (2) Sanchez, Burke, Samuels, McLean, Cohen-Sanchez, Rivera, and Calcano were criminally responsible for the commission of the conspiracy.  (Sanchez Sentencing Tr. 9:19-10:1-17; *see also* Sanchez *Fatico* Tr. 12-13.) Moreover, even without including Cohen-Sanchez and Rivera in the conspiracy – despite the fact that they both pleaded guilty for their participation in the conspiracy – Sanchez still qualifies for the leadership enhancement because Sanchez, Burke, Samuels, McLean, and Calcano constituted a conspiracy of at least five participants.

Sanchez's claim that the Court improperly assessed a weapon enhancement in calculating the Guidelines is also without merit.  Sanchez argues that the testimony at the *Fatico* hearing demonstrates that he did not want guns around him or his business, and that he neither saw nor was in the presence of guns.  (Sanchez *Fatico* Tr. 23:7-8, 43:12-16, 44:4-7.)  However, Sanchez's avowed distaste for guns is irrelevant, since the weapon enhancement simply requires that "the gun possession was a 'reasonably foreseeable act[] . . . that occurred during the commission of the offense of conviction," not that Sanchez endorsed the use of guns.  *Sanchez*, 419 Fed. App'x at 32. Here, Burke's testimony convincingly demonstrated that gun possession in the course of the conspiracy was reasonably foreseeable to Sanchez.  According to Burke, Sanchez said that if somebody ever became a problem or a threat, Samuels, one of Sanchez's loyal followers, "would be able to provide th[e] service of" "shooting them." (Trial Tr. 558:3-4.)  Burke also testified that, although Sanchez was not present at the meeting, Sanchez knew that Samuels went to a meeting with a cocaine supplier to provide Burke with "backup in case there was any gun fight or problem." (*Id.* at 585:22-23; Sanchez *Fatico* Tr. 24:4-5.)  Moreover, Burke stated outright that Sanchez "knew [Samuels and others] had guns."  (Sanchez *Fatico* Tr. 23:3.)  Thus, the evidence amply supported the Court's application of the weapon enhancement and, contrary to Sanchez's

assertions, he need not have admitted that he was a leader or organizer, or that he or a co-conspirator ever possessed a gun, for the Court to determine that the leadership and weapon enhancements applied.

Sanchez also asserts that at the *Fatico* hearing, Burke lied about Sanchez's awareness of Samuels's firearm. (Sanchez Pet. at 5-6.) Obviously, the Court reached a different conclusion as to Burke's veracity, and it was not improper for the Court to rely significantly on Burke's testimony at Samuels and McLean's trial and Sanchez's *Fatico* hearing to determine that the evidence supported the application of the leadership and weapon sentencing enhancements. Rather, the Court found (and the Second Circuit agreed) that the evidence was sufficient to demonstrate by a preponderance that Sanchez was a "leader of a criminal activity that involved five or more participants or was otherwise extensive," pursuant to U.S.S.G. § 2D1.1(b)(1), and that "a dangerous weapon (including a firearm) was possessed" by his co-conspirator, pursuant to U.S.S.G. § 3B1.1(a).

### 2. Drug Quantity Determination

Sanchez next argues that the Court improperly calculated the drug quantities for which Sanchez could be held accountable. Specifically, Sanchez asserts that drug quantity must always be "proved to a jury to support . . . a sentence on an aggravated offense under [Section] 841," (Sanchez Pet. at 2 (quoting *United States v. Gonzalez*, 420 F.3d 11, 123-25 (2d Cir. 2005))), and a "sentencing judge may not, without further findings, simply sentence a defendant according to the amount of narcotics involved in the conspiracy," (Sanchez Pet. at 4 (quoting *United States v. Okayfor*, 996 F.2d 116, 120-21 (6th Cir. 1993))). Sanchez further argues that the Court failed to make a "particularized finding" as to whether "the activity was foreseeable" to him and a particularized finding of "the scope of the criminal activity agreed upon" by Sanchez and his

coconspirators.  (Sanchez Pet. at 3 (quoting *United States v. Studley*, 47 F.3d 569, 574-75 (2d Cir. 1995))).

Samuels's first contention is procedurally barred by the mandate rule since the Second Circuit already rejected his argument that the Court was not permitted to engage in judicial fact-finding pursuant to the advisory Sentencing Guidelines.  *Sanchez*, 419 F. App'x at 33.  And while Sanchez asserts that he should not be barred from making this argument in light of the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013) – which he claims overturned the Second Circuit's holding in *Sanchez* (Sanchez Rep. at 2) – he clearly misinterprets *Alleyne*, which merely held that any fact that increases a mandatory minimum must be found by a jury, *id.* at 2155.  Indeed, the Supreme Court explicitly stated that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury," for the Supreme Court has "long recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment."  *Id.* at 2163.  Therefore, *Alleyne* did not disturb *Sanchez*'s holding that the Court was permitted to engage in judicial fact-finding pursuant to the advisory Sentencing Guidelines.

*Alleyne* also did not overturn *Gonzalez*, which simply requires that a jury determine, or a defendant plead guilty to, each element of a crime, including "the statutory drug quantity . . . in all prosecutions of aggravated [Section] 841 offenses."  *Gonzalez*, 420 F.3d at 115.  Here, of course, Sanchez pleaded guilty to an aggravated Section 841 offense for which the applicable statutory drug quantity was five kilograms.  21 U.S.C. § 841(b)(1)(A)(ii).  Indeed, Sanchez specifically allocuted to distributing five or more kilograms during his guilty plea.  (Sanchez Plea Tr. 29:9-11.)  This is clearly sufficient to satisfy *Gonzalez*'s requirement that a defendant admit to the statutory threshold for an aggravated Section 841 offense.  420 F.3d at 115.

Sanchez's second contention – that the Court improperly determined the amount of drugs that was foreseeable to Sanchez and within the scope of the criminal activity to which he agreed – is equally unpersuasive. As noted above, the law is clear that a court may make findings regarding drug quantities to establish a base offense level with respect to the advisory Sentencing Guidelines. *United States v. Garcia*, 413 F.3d 201, 222-23 (2d Cir. 2005). In order to make such findings, the Court need only determine drug quantity by a preponderance of the evidence. *United States v. Jones*, 531 F.3d 163, 175 (2d Cir. 2008). At sentencing, the Court relied on Burke's testimony regarding Sanchez's role in the conspiracy, the foreseeability of the quantity of drugs involved, and the scope of Sanchez's criminal activity relative to the entire criminal conspiracy. Burke testified that there were multiple shipments of cocaine that exceeded 150 kilograms of cocaine and that the total amount that he and Sanchez distributed was "over 400 kilos of cocaine." (Trial Tr. 500:25-501:1, 505:21-24; Sanchez *Fatico* Tr. 11:3-4.) This testimony was corroborated by the fact that the government made two separate seizures of cocaine, one of 225 kilograms and the other of 72 kilograms, from containers destined for Sanchez's drug trafficking organization. (Sanchez Plea Tr. 32:12-15; Trial Tr. 1391:21-1392:8.) Burke further testified that the cocaine "was transported [in shipping containers] from [the port] to the containers yard in Kearny, which was adjacent to [Sanchez's] office," and was subsequently unloaded and divided there, while Sanchez was present. (Trial Tr. 495:16-17, 501:7-20.) He also stated that Sanchez handled the cocaine on multiple occasions and gave it to his co-conspirators to sell. (*Id.* at 509:8-17, 510:21-22.) Given the Court's finding that Burke was wholly credible and corroborated in numerous particulars, the Court was justified in determining, based on the evidence presented at the trial and at the *Fatico* hearing, that the "the conspiracy-wide quantity was within the scope of the criminal activity [Sanchez] agreed to" and that "the activity in question was foreseeable" to Sanchez. *United States*

*v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006).   In sum, the Court finds that ample evidence justified the conclusion that Sanchez's base offense level was 38.

### 3.   Ineffective Assistance of Counsel

Sanchez finally contends that his counsel was ineffective for failing to locate and present to the Court security tapes from Sanchez's businesses that Sanchez asserts would have undermined Burke's testimony.  (Sanchez Pet. at 5; Sanchez Trav. at 1-2.)  Specifically, Sanchez alleges that the tapes would have demonstrated that (1) Sanchez never saw guns at his business, (2) guns were never present in his office or in the yard when Sanchez was around, (3) Sanchez was not present during a specific meeting at which guns were allegedly present, and (4) Burke, not Sanchez, oversaw the unloading of the cocaine from the trucks.  (Sanchez Trav. at 2.)  Sanchez posits that had the Court considered this evidence, his sentence would have been reduced.

Sanchez asserts that these tapes exist but presents no supporting evidence.  Furthermore, while Sanchez contends that he "advised [his] counsel of the tapes and the contents of them and how they would assist the defense in showing that Burke was testifying falsely" (Sanchez Pet. at 5), Burke testified that "[a]nytime we had an operation of this sort, receiving a container or delivering drugs, the cameras [at Sanchez's business] would go off" (Trial Tr. 583:17-18).  But even assuming the existence of these tapes, Sanchez's ineffective assistance of counsel claim would still fail because Sanchez cannot demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  To apply the weapon enhancement, the Court need only have concluded that the possession of a gun was a reasonably foreseeable act of the conspiracy.  As stated earlier, the fact that Sanchez was never in the same room as a gun or saw a gun *at his business* does not undermine the Court's conclusion that a co-conspirator possessing a gun was

foreseeable to Sanchez. Moreover, the fact that on one occasion Burke, rather than Sanchez, supervised the unloading of the cocaine, does not undermine the Court's finding that Sanchez was a leader of this conspiracy. Thus, even if the tapes existed, had been presented, and had demonstrated everything Sanchez contends they would, they would still not disturb the Court's finding that the weapon and leadership role enhancements were justified. Accordingly Sanchez cannot demonstrate that but for the failure of his counsel to present the tapes, the sentence imposed would have been different. As a result, Sanchez's ineffective assistance of counsel claim likewise fails.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT McLean's, Samuels's, and Sanchez's petitions for a writ of habeas corpus are denied. IT IS FURTHER ORDERED THAT Samuels's recusal motion is denied. The Clerk of the Court is respectfully directed to close the motions pending at docket numbers 291, 323, 338, and 340 in 08-cr-789 (RJS), docket number 14 in 12-cv-7559 (RJS), and docket number 2 in 12-cv-7362 (RJS). The Clerk of the Court is also respectfully directed to close 12-cv-7559 (RJS), 12-cv-7362 (RJS), and 12-cv-1954 (RJS).

SO ORDERED.

Dated:     July 13, 2016
           New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7.13.16

34