# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

April 17, 2020

**VIA ECF AND EMAIL**
Honorable Richard J. Sullivan
United States District Court
Southern District of New York
New York, NY 10007

*Re:*     *United States v. Roberto Sanchez, 08-Cr-789*
        Emergency Motion for Compassionate Release Due to COVID-19 Outbreak at FCI
        Elkton

Your Honor:

       Roberto Sanchez, through undersigned counsel, respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) for an order reducing his sentence to time served based on his age and medical condition (diabetes and hypertension). The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Mr. Sanchez's health.

       Attorney General Barr has recognized that FCI Elkton, where Mr. Sanchez is housed, is one of three federal prisons "most affected by COVID-19," and that the virus is "an emergency condition" that is "materially affecting operations" in that facility. Exhibit A at 1–2 (Attorney General William Barr, *Memorandum for Director of Prisons Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, Apr. 3, 2020). At the time of this writing, according to the BOP's public website, 28 inmates and 12 staff members at the facility have tested positive for COVID-19.[1] The virus thrives in densely packed populations. FCI Elkton has proven that it is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Sanchez.

       Mr. Sanchez is especially vulnerable to the threat of COVID-19, because he suffers from diagnosed diabetes and hypertension, for which he takes prescribed insulin, Chlothalidone, Atorvastatin, Duoloxetine, and baby aspirin. The American Diabetes Association warns those with diabetes "are more likely to experience severe symptoms and complications when infected"

---

[1] *BOP: COVID-19 Update*, Federal Bureau of Prisons (Apr. 15, 2020) *at* https://www.bop.gov/coronavirus/.

with COVID-19.[2]  Indeed, the CDC's data has found that 10.9% of those with severe COVID-19 symptoms were diabetics.[3]

Compounding his diabetes, Mr. Sanchez faces the additional hurdle of managing his hypertension in the midst of this pandemic.  People with hypertension "are at higher risk for severe COVID-19 infection,"[4] as confirmed by the Centers for Disease Control and Prevention.[5] Allowing Mr. Sanchez to be released is the only prudent response to the extraordinary and compelling circumstances created by the rampant spread of the novel coronavirus at FCI Elkton, especially given that Mr. Sanchez has already served the vast majority of his 240-month sentence.

Mr. Sanchez's circumstances satisfy the "extraordinary and compelling reasons" standard under § 3582(c)(1)(A)(i), as elaborated by the Sentencing Commission in U.S.S.G. § 1B1.13. After considering the applicable factors set forth in 18 U.S.C. § 3553(a), we respectfully request that the Court reduce Mr. Sanchez's sentence to time served and modify the terms of supervised release to accommodate his probation-approved release plan.

## I. Procedural History

On September 24, 2009, this Court sentenced Mr. Sanchez to 240 months of imprisonment after he entered a plea of guilty to conspiracy to distribute cocaine.  A few months ago, Mr. Sanchez was transferred to FCI Elkton where they "are experiencing significant levels of infection."  Exhibit A at 1.  Given the grave circumstances with the transmission of COVID-19 at FCI Elkton, on April 3, 2020, Attorney General Barr directed that the BOP "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at . . . FCI Elkton," citing his newly-expanded powers under the Coronavirus Aid Relief and Economic Security (CARES) Act.  Exhibit A at 1. His directive applied to "all at-risk inmates—not only those who were previously eligible for transfer." *Id*. at 2. On April 9, 2020, Mr. Sanchez, through counsel, submitted a letter to FCI Elkton Warden formally requesting a reduction in his sentence in light of these provisions and directives. Exhibit B (email to Warden).  On April 11, 2020, counsel received a boilerplate email from FCI Elkton regarding their general efforts to review cases for home confinement eligibility.  Exhibit C (email from FCI Elkton).  As of today, April

---

[2] American Diabetes Association, *Do people with diabetes have a higher chance of experiencing serious complications from COVID-19?, COVID-19*, https://www.diabetes.org/covid-19-faq.

[3] *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 – United States, February 12 – March 28, 2020*, CDC, https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm#F1_down.

[4] Lei Fang, George Karakiulakis, Michael Roth, *Are Patients With Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?*, The Lancet (Mar. 11, 2020), *at* https://www.thelancet.com/pdfs/journals/lanres/PIIS2213-2600(20)30116-8.pdf.

[5] *Morbidity and Mortality Weekly Report: Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, Centers for Disease Control and Prevention (Apr. 3, 2020), *at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

16, 2020, no decision regarding his application for sentence modification has been received by counsel from the facility, even though others have been either released or moved to pre-release quarantine.

## II. Mr. Sanchez's Current Conditions of Confinement and Health Conditions

By their nature, prisons are infectious disease vectors, as individuals are held in close quarters, without any ability to practice social distancing or other preventative measures. As explained, FCI Elkton is being hit particularly hard by the virus and Mr. Sanchez's age and medical history make him especially vulnerable to the threat of COVID-19. While at FCI Elkton, Mr. Sanchez has been receiving treatment for his diabetes and hypertension.[6] Doctors at the facility prescribed him daily insulin, as well as daily medication to control his high cholesterol and high blood pressure, which he takes daily as directed.

Diabetics are listed as one of the high risk populations for COVID-19 infection. As the CDC warns, those with diabetes are at "a higher risk of getting very sick from COVID-19."[7] Indeed, the largest study relevant to COVID-19 patients with diabetes involved 72,314 cases.[8] COVID-19 positive patients with diabetes had a threefold higher mortality rate than those without diabetes (7.3% versus 2.3%, respectively).[9]

People with hypertension "are at higher risk for severe COVID-19 infection," as confirmed by the Centers for Disease Control and Prevention.[10] Mr. Sanchez reports that many 30 to 40 inmates on his housing unit have developed symptoms consistent with COVID-19, and many have been transferred into the COVID-19 quarantine unit. Troublingly, Mr. Sanchez has also observed that symptomatic inmates are not being quarantined for the necessary 14 days to limit the spread of infection. Rather, symptomatic inmates have been returning to his unit after only a 7-day quarantine.

## III. Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Sanchez's Sentence.

The First Step Act ("FSA") expressly permits Mr. Sanchez to move this Court to seek

---

[6] Due to the current crisis, I am unable to access Mr. Sanchez's medical records within the BOP. It is my understanding that the government can confirm this information with the facility.

[7] *Groups at Higher Risk for Severe Illness, Coronavirus Disease 2019 (COVID-19)*, CDC (Apr. 16, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[8] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVI-19), Summary of a Report of 72314 Cases From the Chinese Center for Disease Control and Prevention*, JAMA (Feb. 24, 2020) https://jamanetwork.com/journals/jama/fullarticle/2762130.

[9] *Id.*

[10] *See supra* n.4 and n.5.

compassionate release, by which this Court may reduce his term of imprisonment. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* As indicated, on April 9, 2020, undersigned counsel transmitted Mr. Sanchez's request to the warden of FCI Elkton via email. Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Sanchez files this motion now in light of the urgent nature of this matter. *See infra* Part III. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id.* (*quoting* 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).

### A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.

The Court need not and should not wait for Mr. Sanchez to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Sanchez. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile."). Federal courts have found that they can hear compassionate release applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *E.g.*, *United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). Specifically, courts across the country, and within this Circuit, have so held on the basis of the COVID-19 pandemic. *See United States v. Perez*, 17-CR-513 (AT) (S.D.N.Y.), ECF No. 98 (Apr. 1, 2020) (finding three exceptions to exhaustion applicable: (1) futility; (2) where the administrative process is incapable of providing the requested relief; (3) where the defendant is subjected to undue prejudice), *see also United States v. Zukerman*, 16-CR-194 (AT) (S.D.N.Y.),

ECF No. 116 (Apr. 3, 2020) (same); *United States v. Colvin*, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (waiving exhaustion); *United States v. Powell*, 94 Cr. 316 (D.D.C.), ECF. No. 98 (Mar. 28, 2020) (same); *United States v. Huneeus*, 19-CR-10117 (D. Mass), ECF No. 642 (Mar. 17, 2020) (same).

These decisions waiving exhaustion accord with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975): "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." 422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), waiving exhaustion will "merely [ ] enable [Mr. Sanchez] to receive the procedure [he] should have been afforded in the first place"—it will simply advance by what could be a crucial twenty-two days this Court's consideration of Mr. Sanchez's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the

absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)). Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept even more widely throughout FCI Elkton than it already has).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis. The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. In light of the facility's lack of meaningful response to Mr. Sanchez's request for a sentence modification, it would be futile to force Mr. Sanchez to exhaust his administrative remedies—at the cost of his health and, potentially, his life.

COVID-19 has already begun to spread like wildfire in FCI Elkton. Already, as of April 16, 2020, 39 inmates and 34 staff members have tested positive and there have been six inmate deaths – the second highest number of deaths among BOP facilities. *See* n.1. With the speed and unpredictability of this pandemic in the facility, recognized by the Attorney General as one of the three worst hit in the entire BOP, Exhibit A, waiting even twenty-two days will be too late. Accordingly, this Court should exercise jurisdiction over Mr. Sanchez's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

**B. "Extraordinary and compelling reasons" warrant a reduction in Mr. Sanchez's sentence.**

The COVID-19 pandemic continues to roil the United States, and FCI Elkton in particular. As of April 17, 2020, the United States has 667,844 confirmed positive cases and has

Page 7 of 9

had 30,659 deaths.[11] There have been 473 inmate positives, 39 within FCI Elkton, and 18 inmate deaths within the Bureau of Prisons, 6 of those within FCI Elkton.[12] The numbers of positive inmates are likely higher, as testing is unavailable to inmates except those that are hospitalized. *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested"). Information and statistics that BOP provided to Congress on April 7, 2020, reflect that 456 people are in isolation due to being symptomatic, and 3,850 inmates are in quarantine.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19.[13] In jails, "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise." *Id.* Though the BOP purports to be screening inmates, as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1. Indeed, as the following chart demonstrates, the rate of COVID-19 transmission among BOP inmates and BOP staff is significantly higher than the public, demonstrating that the danger of these incarceratory conditions to a person as vulnerable as Mr. Sanchez:



---

[11] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (Apr. 16, 2020), *at* https://nyti.ms/2UIkCz4.

[12] *See supra* n. 1

[13] *See* Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, *at* https://academic.oup.com/cid/article/45/8/1047/344842.

Mr. Sanchez is particularly vulnerable to COVID-19, due to his diabetes and his hypertension at a facility overrun with the disease. This is an "extraordinary and compelling reason" for his release. *See* § 1B1.13, Note 1(A) (expressly recognizing that "other reasons" may exist for granting compassionate release); § 1B1.13, Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Mr. Sanchez's high susceptibility to complications should he contract COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the demonstrated failure of FCI Elkton to stop the spread, the inability of Mr. Sanchez to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that he suffers from ailments and is of an age that renders him at higher risk, this Court should find that Mr. Sanchez's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

**IV. Mr. Sanchez Has A Stable Home To Live In, if Released To Home Detention, Where He Will Be Safer and The Public Will Be Safe.**

If released, Mr. Sanchez will not be completely at liberty; he will be confined to his brother's home located in Garfield, NJ.  The tristate area has been the epicenter of the pandemic. To combat the virus, the governor of New Jersey has issued a stay at home order, which if violated, a person could face six months incarceration and/or a $1000 fine. Unlike usual circumstances, Mr. Sanchez's life would be in jeopardy if he unnecessarily exposed himself to COVID-19.

I have spoken with Mr. Sanchez's brother, Joseph Rivera, and he has confirmed that Mr. Sanchez is welcome to live with him, and he is eager for him to do so. Mr. Rivera lives in an apartment in Garfield, NJ alone and is excited for the opportunity to have his brother live with him. Thankfully, Mr. Rivera is not experiencing COVID-19 symptoms, unlike many of these people with whom Mr. Sanchez is in close contact at FCI Elkton. His brother, who is readily available by telephone, is willing to have Mr. Sanchez come home now, and quarantine at his home (where he will remain, full time, if this application is granted), rather than at the facility.

Undoubtedly, Mr. Sanchez will be better able to practice social distancing and handwashing at his brother's home than inside of a federal prison. Should Mr. Sanchez become afflicted, he will be far more able to access quality medical care in the community than within this prison. Mr. Sanchez presents no risk of flight or danger that outweigh the risks to his health of remaining in prison while this pandemic ravages through its walls. Mr. Sanchez has never lost good time during the twelve years of his incarceration and has completed more than 80 programs, his GED, as well as drug programming. His eligibility for a halfway house transfer is nearing and Mr. Sanchez's stellar record while incarcerated demonstrates that he presents no risk

to the community upon his release. This Court should step in to protect Mr. Sanchez's health, and perhaps, without exaggeration, to save his life.

## V. Conclusion

For the foregoing reasons, Mr. Sanchez respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to begin his term of supervised release or, in the alternative, hold a telephonic hearing as soon as possible. Should the Court wish to hold a hearing, counsel waives Mr. Sanchez's appearance, upon his consent.

Thank you for your consideration of this motion. I have enclosed a proposed Order for the Court's consideration.

Respectfully submitted,

/s/ *Marisa K. Cabrera*

Marisa K. Cabrera, Esq.
Assistant Federal Defender
(917) 890-7612

cc: AUSA Michael Dennis Lockhard (by email and ECF)