**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

April 20, 2020

**VIA ECF**
Honorable Richard J. Sullivan
United States District Court
Southern District of New York
New York, NY 10007

    Re:    *United States v. Roberto Sanchez, 08-Cr-789*
           Supplement to Motion for Compassionate Release Due to COVID-19 Outbreak at FCI Elkton

Your Honor:

      On November 26, 2019, Roberto Sanchez filed a pro se letter to this Court seeking compassionate release on the grounds that he had served more than half his sentence, his successful completion of various types of prison programming, and his family. Since the filing of that motion, there has been an unprecedented outbreak of COVID-19 throughout the country and in FCI Elkton – the facility where Mr. Sanchez is currently housed. On April 9, 2020, Mr. Sanchez filed a letter with the Court, referring to his prior compassionate release motion and noting his health conditions in light of the COVID-19 outbreak. On April 9, 2020, through undersigned counsel, Mr. Sanchez filed a letter to the warden at FCI Elkton seeking compassionate release based on the recent COVID-19 outbreak. On April 17, 2020, through undersigned counsel, Mr. Sanchez filed another compassion release motion to the Court seeking compassionate release, specifically citing the recent developments of the COVID-19 outbreak and Mr. Sanchez's at-risk status as the primary bases. On April 20, 2020, this Court denied the April 17, 2020 compassionate release motion without prejudice on the grounds that Mr. Sanchez did not exhaust his administrative remedies in light of his pending November 26, 2019 motion. Additionally, this Court ordered that counsel inform the court whether she would represent Mr. Sanchez on November 26, 2019 motion moving forward.

      Undersigned counsel will represent Mr. Sanchez on his pending November 26, 2019 motion. Additionally, Mr. Sanchez seeks to submit this letter and the information contained therein as a supplement to his original November 26, 2019 motion seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) for an order reducing his sentence to time served based on his age and medical condition (diabetes and hypertension). The unprecedented threat of COVID-19 could not have been foreseen at sentencing or at the time of his November 26, 2019 motion, and poses extraordinary risks to Mr. Sanchez's health.

Attorney General Barr has recognized that FCI Elkton, where Mr. Sanchez is housed, is one of three federal prisons "most affected by COVID-19," and that the virus is "an emergency condition" that is "materially affecting operations" in that facility. Exhibit A at 1–2 (Attorney General William Barr, *Memorandum for Director of Prisons Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, Apr. 3, 2020). At the time of this writing, according to the BOP's public website, 28 inmates and 12 staff members at the facility have tested positive for COVID-19.[1] The virus thrives in densely packed populations. FCI Elkton has proven that it is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Sanchez.

Mr. Sanchez is especially vulnerable to the threat of COVID-19, because he suffers from diagnosed diabetes and hypertension, for which he takes prescribed insulin, Chlothalidone, Atorvastatin, Duoloxetine, and baby aspirin. The American Diabetes Association warns those with diabetes "are more likely to experience severe symptoms and complications when infected" with COVID-19.[2]  Indeed, the CDC's data has found that 10.9% of those with severe COVID-19 symptoms were diabetics.[3]

Compounding his diabetes, Mr. Sanchez faces the additional hurdle of managing his hypertension in the midst of this pandemic.  People with hypertension "are at higher risk for severe COVID-19 infection,"[4] as confirmed by the Centers for Disease Control and Prevention.[5] Allowing Mr. Sanchez to be released is the only prudent response to the extraordinary and compelling circumstances created by the rampant spread of the novel coronavirus at FCI Elkton, especially given that Mr. Sanchez has already served the vast majority of his 240-month sentence.

Mr. Sanchez's circumstances satisfy the "extraordinary and compelling reasons" standard under § 3582(c)(1)(A)(i), as elaborated by the Sentencing Commission in U.S.S.G. § 1B1.13. After considering the applicable factors set forth in 18 U.S.C. § 3553(a), we respectfully request that the Court reduce Mr. Sanchez's sentence to time served and modify the terms of supervised release to accommodate his probation-approved release plan.

---

[1] *BOP: COVID-19 Update*, Federal Bureau of Prisons (Apr. 15, 2020) *at* https://www.bop.gov/coronavirus/.

[2] American Diabetes Association, *Do people with diabetes have a higher chance of experiencing serious complications from COVID-19?, COVID-19*, https://www.diabetes.org/covid-19-faq.

[3] *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 – United States, February 12 – March 28, 2020*, CDC, https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm#F1_down.

[4] Lei Fang, George Karakiulakis, Michael Roth, *Are Patients With Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?*, The Lancet (Mar. 11, 2020), *at* https://www.thelancet.com/pdfs/journals/lanres/PIIS2213-2600(20)30116-8.pdf.

[5] *Morbidity and Mortality Weekly Report: Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, Centers for Disease Control and Prevention (Apr. 3, 2020), *at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

**I. Procedural History**

On September 24, 2009, this Court sentenced Mr. Sanchez to 240 months of imprisonment after he entered a plea of guilty to conspiracy to distribute cocaine. A few months ago, Mr. Sanchez was transferred to FCI Elkton where they "are experiencing significant levels of infection." Exhibit A at 1. Given the grave circumstances with the transmission of COVID-19 at FCI Elkton, on April 3, 2020, Attorney General Barr directed that the BOP "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at . . . FCI Elkton," citing his newly-expanded powers under the Coronavirus Aid Relief and Economic Security (CARES) Act. Exhibit A at 1. His directive applied to "all at-risk inmates—not only those who were previously eligible for transfer." *Id*. at 2. On April 9, 2020, Mr. Sanchez, through counsel, submitted a letter to FCI Elkton Warden formally requesting a reduction in his sentence in light of these provisions and directives. Exhibit B (email to Warden). On April 11, 2020, counsel received a boilerplate email from FCI Elkton regarding their general efforts to review cases for home confinement eligibility. Exhibit C (email from FCI Elkton). As of today, April 20, 2020, no decision regarding his application for sentence modification has been received by counsel from the facility, even though others have been either released or moved to pre-release quarantine.

**II. Mr. Sanchez's Current Conditions of Confinement and Health Conditions**

By their nature, prisons are infectious disease vectors, as individuals are held in close quarters, without any ability to practice social distancing or other preventative measures. As explained, FCI Elkton is being hit particularly hard by the virus and Mr. Sanchez's age and medical history make him especially vulnerable to the threat of COVID-19. While at FCI Elkton, Mr. Sanchez has been receiving treatment for his diabetes and hypertension.[6] Doctors at the facility prescribed him daily insulin, as well as daily medication to control his high cholesterol and high blood pressure, which he takes daily as directed.

Diabetics are listed as one of the high risk populations for COVID-19 infection. As the CDC warns, those with diabetes are at "a higher risk of getting very sick from COVID-19."[7] Indeed, the largest study relevant to COVID-19 patients with diabetes involved 72,314 cases.[8] COVID-19 positive patients with diabetes had a threefold higher mortality rate than those without diabetes (7.3% versus 2.3%, respectively).[9]

---

[6] Due to the current crisis, I am unable to access Mr. Sanchez's medical records within the BOP. It is my understanding that the government can confirm this information with the facility.

[7] *Groups at Higher Risk for Severe Illness, Coronavirus Disease 2019 (COVID-19)*, CDC (Apr. 16, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[8] Zunyou Wu & Jennifer M. McGoogan, *Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVI-19), Summary of a Report of 72314 Cases From the Chinese Center for Disease Control and Prevention*, JAMA (Feb. 24, 2020) https://jamanetwork.com/journals/jama/fullarticle/2762130.

[9] *Id.*

People with hypertension "are at higher risk for severe COVID-19 infection," as confirmed by the Centers for Disease Control and Prevention.[10] Mr. Sanchez reports that many 30 to 40 inmates on his housing unit have developed symptoms consistent with COVID-19, and many have been transferred into the COVID-19 quarantine unit. Troublingly, Mr. Sanchez has also observed that symptomatic inmates are not being quarantined for the necessary 14 days to limit the spread of infection. Rather, symptomatic inmates have been returning to his unit after only a 7-day quarantine.

### III. Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Sanchez's Sentence.

The First Step Act ("FSA") expressly permits Mr. Sanchez to move this Court to seek compassionate release, by which this Court may reduce his term of imprisonment. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* As indicated, on April 9, 2020, undersigned counsel transmitted Mr. Sanchez's request to the warden of FCI Elkton via email. Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Sanchez files this motion now in light of the urgent nature of this matter. *See infra* Part III. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id.* (*quoting* 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).

---

[10] *See supra* n.4 and n.5.

### A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.

The Court need not and should not wait for Mr. Sanchez to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Sanchez. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile."). Federal courts have found that they can hear compassionate release applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *E.g., United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). Specifically, courts across the country, and within this Circuit, have so held on the basis of the COVID-19 pandemic. *See United States v. Perez*, 17-CR-513 (AT) (S.D.N.Y.), ECF No. 98 (Apr. 1, 2020) (finding three exceptions to exhaustion applicable: (1) futility; (2) where the administrative process is incapable of providing the requested relief; (3) where the defendant is subjected to undue prejudice), *see also United States v. Zukerman*, 16-CR-194 (AT) (S.D.N.Y.), ECF No. 116 (Apr. 3, 2020) (same); *United States v. Colvin*, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (waiving exhaustion); *United States v. Powell*, 94 Cr. 316 (D.D.C.), ECF. No. 98 (Mar. 28, 2020) (same); *United States v. Huneeus*, 19-CR-10117 (D. Mass), ECF No. 642 (Mar. 17, 2020) (same).

These decisions waiving exhaustion accord with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975): "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." 422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also*

*Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), waiving exhaustion will "merely [ ] enable [Mr. Sanchez] to receive the procedure [he] should have been afforded in the first place"—it will simply advance by what could be a crucial twenty-two days this Court's consideration of Mr. Sanchez's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)). Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept even more widely throughout FCI Elkton than it already has).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis. The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. In light of the facility's lack of meaningful response to Mr. Sanchez's request for a sentence

modification, it would be futile to force Mr. Sanchez to exhaust his administrative remedies—at the cost of his health and, potentially, his life.

COVID-19 has already begun to spread like wildfire in FCI Elkton. Already, as of April 20, 2020, 51 inmates and 40 staff members have tested positive and there have been <u>six inmate deaths</u> – the second highest number of deaths among BOP facilities. *See* n.1. With the speed and unpredictability of this pandemic in the facility, recognized by the Attorney General as one of the three worst hit in the entire BOP, Exhibit A, waiting even nineteen days will be too late. Accordingly, this Court should exercise jurisdiction over Mr. Sanchez's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

### B. "Extraordinary and compelling reasons" warrant a reduction in Mr. Sanchez's sentence.

The COVID-19 pandemic continues to roil the United States, and FCI Elkton in particular. As of April 20, 2020, the United States has 770,138 confirmed positive cases and has had 37,186 deaths.[11] There have been 497 inmate positives, 51 within FCI Elkton, and 22 inmate deaths within the Bureau of Prisons, 6 of those within FCI Elkton.[12] The numbers of positive inmates are likely higher, as testing is unavailable to inmates except those that are hospitalized. *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested"). Information and statistics that BOP provided to Congress on April 7, 2020, reflect that 456 people are in isolation due to being symptomatic, and 3,850 inmates are in quarantine.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19.[13] In jails, "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise." *Id.* Though the BOP purports to be screening inmates, as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.

Indeed, as the following chart demonstrates, the rate of COVID-19 transmission within the BOP is significantly higher than the public, demonstrating that the danger of these incarceratory conditions to a person as vulnerable as Mr. Sanchez:

---

[11] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (Apr. 16, 2020), *at* https://nyti.ms/2UIkCz4.

[12] *See supra* n. 1

[13] *See* Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, *at* https://academic.oup.com/cid/article/45/8/1047/344842.

Number of Reported COVID-19 Cases in Bureau of Prisons[14] and the United States[15], Compared by Days since First Reported Infection

| Day of Known COVID-19 Case | BOP Date | BOP Infections | U.S. Date | U.S. Infections |
|---|---|---|---|---|
| Day 1 | 3/20/2020 | 2 | 1/22/2020 | 1 |
| Day 2 | 3/21/2020 | 3 | 1/23/2020 | 1 |
| Day 4 | 3/23/2020 | 6 | 1/25/2020 | 2 |
| Day 5 | 3/24/2020 | 9 | 1/26/2020 | 5 |
| Day 7 | 3/26/2020 | 18 | 1/28/2020 | 5 |
| Day 8 | 3/27/2020 | 27 | 1/29/2020 | 5 |
| Day 10 | 3/29/2020 | 38 | 1/31/2020 | 7 |
| Day 11 | 3/30/2020 | 52 | 2/1/2020 | 8 |
| Day 12 | 3/31/2020 | 59 | 2/2/2020 | 8 |
| Day 13 | 4/1/2020 | 94 | 2/3/2020 | 11 |
| Day 14 | 4/2/2020 | 114 | 2/4/2020 | 11 |
| Day 15 | 4/3/2020 | 141 | 2/5/2020 | 11 |
| Day 16 | 4/4/2020 | 174 | 2/6/2020 | 11 |
| Day 17 | 4/5/2020 | 197 | 2/7/2020 | 11 |
| Day 18 | 4/6/2020 | 259 | 2/8/2020 | 11 |
| Day 19 | 4/7/2020 | 313 | 2/9/2020 | 11 |
| Day 20 | 4/8/2020 | 377 | 2/10/2020 | 11 |
| Day 21 | 4/9/2020 | 408 | 2/11/2020 | 12 |
| Day 22 | 4/10/2020 | 481 | 2/12/2020 | 12 |
| Day 23 | 4/11/2020 | 520 | 2/13/2020 | 13 |
| Day 24 | 4/12/2020 | 541 | 2/14/2020 | 13 |
| Day 25 | 4/13/2020 | 589 | 2/15/2020 | 13 |
| Day 26 | 4/14/2020 | 694 | 2/16/2020 | 13 |
| Day 27 | 4/15/2020 | 731 | 2/17/2020 | 13 |
| Day 28 | 4/16/2020 | 752 | 2/18/2020 | 13 |
| Day 29 | 4/17/2020 | 761 | 2/19/2020 | 13 |

---

[14] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

[15] Numbers obtained from https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

Page 9 of 10

| Day 30 | 4/18/2020 | 784 | 2/20/2020 | 13 |
| Day 31 | 4/19/2020 | 804 | 2/21/2020 | 15 |

Mr. Sanchez is particularly vulnerable to COVID-19, due to his diabetes and his hypertension at a facility overrun with the disease. This is an "extraordinary and compelling reason" for his release. *See* § 1B1.13, Note 1(A) (expressly recognizing that "other reasons" may exist for granting compassionate release); § 1B1.13, Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Mr. Sanchez's high susceptibility to complications should he contract COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the demonstrated failure of FCI Elkton to stop the spread, the inability of Mr. Sanchez to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that he suffers from ailments and is of an age that renders him at higher risk, this Court should find that Mr. Sanchez's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

**IV. Mr. Sanchez Has A Stable Home To Live In, if Released To Home Detention, Where He Will Be Safer and The Public Will Be Safe.**

If released, Mr. Sanchez will not be completely at liberty; he will be confined to his brother's home located in Garfield, NJ. The tristate area has been the epicenter of the pandemic. To combat the virus, the governor of New Jersey has issued a stay at home order, which if violated, a person could face six months incarceration and/or a $1000 fine. Unlike usual circumstances, Mr. Sanchez's life would be in jeopardy if he unnecessarily exposed himself to COVID-19.

I have spoken with Mr. Sanchez's brother, Joseph Rivera, and he has confirmed that Mr. Sanchez is welcome to live with him, and he is eager for him to do so. Mr. Rivera lives in an apartment in Garfield, NJ alone and is excited for the opportunity to have his brother live with him. Thankfully, Mr. Rivera is not experiencing COVID-19 symptoms, unlike many of these people with whom Mr. Sanchez is in close contact at FCI Elkton. His brother, who is readily available by telephone, is willing to have Mr. Sanchez come home now, and quarantine at his home (where he will remain, full time, if this application is granted), rather than at the facility.

Undoubtedly, Mr. Sanchez will be better able to practice social distancing and handwashing at his brother's home than inside of a federal prison. Should Mr. Sanchez become afflicted, he will be far more able to access quality medical care in the community than within this prison. Mr. Sanchez presents no risk of flight or danger that outweigh the risks to his health of remaining in prison while this pandemic ravages through its walls. Mr. Sanchez has never lost

good time during the twelve years of his incarceration and has completed more than 80 programs, his GED, as well as drug programming. His eligibility for a halfway house transfer is nearing and Mr. Sanchez's stellar record while incarcerated demonstrates that he presents no risk to the community upon his release. This Court should step in to protect Mr. Sanchez's health, and perhaps, without exaggeration, to save his life.

**V. Conclusion**

For the foregoing reasons, Mr. Sanchez respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to begin his term of supervised release or, in the alternative, hold a telephonic hearing as soon as possible. Should the Court wish to hold a hearing, counsel waives Mr. Sanchez's appearance, upon his consent.

Thank you for your consideration of this motion. I have enclosed a proposed Order for the Court's consideration.

Respectfully submitted,

/s/ *Marisa K. Cabrera*

Marisa K. Cabrera, Esq.
Assistant Federal Defender
(917) 890-7612

cc: AUSA Michael Dennis Lockard (by email and ECF)