UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :

UNITED STATES OF AMERICA           :

   - v. -                                     :         S2 08 Cr. 789 (RJS)

ROBERTO SANCHEZ,               :

        Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# OPPOSITION TO DEFENDANT ROBERTO SANCHEZ'S MOTION FOR COMPASSIONATE RELEASE

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Michael D. Lockard,
Assistant United States Attorney
 - *Of Counsel* -

## TABLE OF CONTENTS

Page

BACKGROUND ..................................................................................................................1

    A.  The Indictment ..................................................................................................1

    B.  Sanchez's Guilty Plea and Sentencing ..............................................................2

    C.  Post-Conviction Proceedings ............................................................................3

    D.  Sanchez's Motion for Compassionate Release ................................................3

DISCUSSION .....................................................................................................................5

    I.  Compassionate Release ....................................................................................5

    II.  Sanchez's Motion Should Be Denied ..............................................................7

        A.  Sanchez's Risk of COVID-19 Exposure Does Not Warrant a Reduction of Sentence to Time Served ...........................................7

        B.  Sanchez's Request to Reduce His Sentence Is Inconsistent with the Sentencing Factors .......................................................................15

CONCLUSION ..................................................................................................................17

Pursuant to the Court's order dated June 8, 2020, the Government respectfully submits this memorandum of law in opposition to the motion by the defendant, Roberto Sanchez ("Sanchez" or the "defendant") to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).[1] Sanchez seeks a reduction of his sentence to time served based on the spread of coronavirus infectious disease, COVID-19, at the facility where Sanchez is serving his sentence. (*Id.*).

As discussed more fully below, though Sanchez's diabetes places him in the high-risk category for COVID-19 infection under Centers for Disease Control and Prevention ("CDC") guidelines, his health conditions do not warrant a reduction of his sentence to time served, particularly since Sanchez proposes to reside in Bergen County, New Jersey, which reports the highest number of COVID-19 cases and the second-highest number of COVID-19-related deaths in the state. Moreover, the requested sentence reduction would be contrary to the sentencing factors under 18 U.S.C. § 3553(a).

## BACKGROUND

### A.     The Indictment

On February 18, 2009, Sanchez was charged in a superseding indictment, S2 08 Cr. 789 (RJS) (the "Indictment"), with conspiring to distribute, and to possess with intent to distribute, five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846 (Count One). (D.E. 70). The charges in the Indictment arose out of Sanchez's participation in a conspiracy to traffic multi-hundred kilogram quantities of cocaine imported from Panama to the United States through the New York/New Jersey seaport, where Sanchez collected the cocaine

---

[1] In this memorandum, "D.E." refers to entries in the docket, "Motion" refers to Sanchez's May 29, 2020 motion for compassionate release (D.E. 417); "[date] Tr." refers to the transcript of proceedings held on the identified date; and "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office.

and used his trucking company to transport the cocaine for delivery to co-conspirators for further distribution. (PSR ¶¶ 11-16).

Sanchez used his legitimate-seeming trucking business to circumvent port controls and evade detection and interdiction of the South American cocaine. (PSR ¶¶ 12, 13). Sanchez recruited both his wife and his younger brother into the narcotics conspiracy. (PSR ¶¶ 13, 15). Sanchez's brother helped organize cocaine shipments, deliver cash, and distribute cell phones to co-conspirators. (PSR ¶ 15). Sanchez was sometimes paid cash for his role in the network, and sometimes paid in cocaine. (PSR ¶ 21). Sanchez directed other co-conspirators, namely Lenroy McLean and Milton Samuels, to sell his cocaine and give him the profits. (PSR ¶ 15). Samuels also provided protection for the conspirators: on at least one occasion, at Sanchez's and others' behest, Samuels brought a handgun to a money delivery because the cocaine supplier receiving money believed that a seized load of cocaine might have actually been stolen. (PSR ¶ 16). Samuels owned other firearms, including an AK-47. (*Id.*). In the course of the investigation, the DEA seized approximately 300 kilograms of the network's cocaine. (PSR ¶ 16).

B.   **Sanchez's Guilty Plea and Sentencing**

On March 9, 2009, Sanchez pleaded guilty to Count One of the Indictment. (March 9, 2009 Tr.).

On July 28, 2009, the Court held a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979). (July 28, 2009 Tr.). At a sentencing proceeding on September 24, 2009, the Court imposed a sentence of 240 months' imprisonment, a term of supervised release of 60 months, and a fine of $1 million. (Sep. 24, 2009 Tr.; D.E. 140). The Court determined that Sanchez's sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") was 324 to 405 months' imprisonment, based on a total offense level of 41 and a

Criminal History Category of I. (Sep. 24, 2009 Tr.; *see also* D.E. 357 at 2). The total offense level reflected a four-level enhancement for Sanchez's leadership role, a two-level enhancement for the possession of firearms by Sanchez's co-defendants as part of the offense conduct, and a drug quantity in excess of 150 kilograms of cocaine. (Sep. 24, 2009 Tr.; PSR ¶¶ 24-34). *See also United States v. Sanchez*, 419 Fed. Appx. 27, 31-43 (2d Cir. Apr. 5, 2011).

According to the Bureau of Prisons ("BOP") website, Sanchez's current projected release date is August 25, 2025.

### C.    Post-Conviction Proceedings

Following his conviction, Sanchez moved *pro se* for a reduction of his sentence (D.E. 199, 296, 349, 395) and petitioned *pro se* to modify, vacate or reduce his sentence pursuant to 28 U.S.C. § 2255 (12 Civ. 7559 (RJS)). Sanchez's obligation to pay his fine was stayed pending his release (D.E. 252) and the motions were otherwise denied. (D.E. 314, 321, 343, 357, 396).

### D.    Sanchez's Motion for Compassionate Release

On November 26, 2019, Sanchez filed a *pro se* motion for compassionate release pursuant to the First Step Act and 18 U.S.C. § 3582(c)(1)(A) based on his remorse and rehabilitation while incarcerated. (D.E. 402). Sanchez requested a reduction in his sentence to time served, to home confinement, or to release to a halfway house. (*Id*. at 3). The motion indicated that his request was submitted to the BOP on September 4, 2019. (*Id*. at 4-6). On April 9, 2020, Sanchez filed a letter supplementing his motion for compassionate release to include medical condition, namely, his diabetes and high blood pressure and the presence of COVID-19 at FCI Elkton. (D.E. 406).

On April 17, 2020, the defendant, through counsel, filed a supplemental submission expanding on his request for compassionate release based on his medical condition. (D.E. 417).

3

On April 20, 2020, the Court denied Sanchez's request for compassionate release based on medical condition and risk of COVID-19 exposure without prejudice, because the motion was made less than 30 days after Sanchez sought relief from the BOP. (D.E. 410 at 2 (citing *United States v. Ogarro*, 18 Cr. 373 (RJS), 2020 WL 1876300 (S.D.N.Y. Apr. 14, 2020)). Also on April 20, 2020, Sanchez filed a supplemental counseled submission in support of his request for compassionate release based on the risk of COVID-19 exposure. (D.E. 411). On May 21, 2020, the Court denied Sanchez's motion without prejudice to renewal after satisfying 18 U.S.C. § 3582(c)(1)(A)'s exhaustion requirements. (D.E. 416).

On May 29, 2020, Sanchez filed a renewed motion for compassionate release. Sanchez argues that he has satisfied the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A) because he submitted a request for compassionate release to the BOP, and more than 30 days have elapsed without a response from the warden. (Mot. at 2 & Ex. D). Since the Court's June 8, 2020 order directing a response, the Government has not yet confirmed the status of Sanchez's request with BOP. The Government has been advised by BOP counsel, however, that Sanchez's security classification is "low," which is higher than "minimal;" and that his recidivism classification is "medium." Sanchez has had three disciplinary actions in 2019. (Ex. A at 58).

In support of his motion, Sanchez makes the same arguments raised in his April 17 and 20, 2020 submissions. Sanchez argues that his health conditions, particularly diabetes and hypertension, make him at higher risk of serious COVID-19 symptoms (Mot. at 4); that FCI Elkton has not contained the spread of the novel coronavirus (*id*. at 3); and that Sanchez's conditions of confinement as a result of BOP's response to the COVID-19 pandemic warrant a reduction of his sentence. (*Id*. at 5). If released, Sanchez represents that he would live with a family member in Garfield, New Jersey, which is in Bergen County. (*Id*.).

4

On June 8, 2020, the Court directed the Government to respond to Sanchez's renewed motion.

## DISCUSSION

### I. Compassionate Release

18 U.S.C. § 3582(c)(1)(A)(i) authorizes a district court to modify a defendant's sentence based on "extraordinary and compelling reasons." Prior to the enactment of the First Step Act, only the BOP could move for a sentence reduction under this provision, and its decision not to move for compassionate release was not reviewable by the district court. *See, e.g., Stewart v. United States*, 13 Civ. 5279 (JGK), 02 Cr. 395 (JGK), 2013 WL 4044756, *3-6 (S.D.N.Y. Aug. 9, 2013); *see also United States v. Iosifidis*, 13 Cr. 170 (JFK), 2016 WL 3267329, *2 (S.D.N.Y. June 9, 2016). The First Step Act amended this subsection to permit inmates to file motions for compassionate release following the exhaustion of their administrative remedies or 30 days after submitting a request to the appropriate Warden, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

The First Step Act did not alter the requirements for eligibility for compassionate release, which are set forth in § 3582(c)(1)(A) and Section 1B1.13 of the Guidelines. The court may modify a sentence only if it finds, as relevant here, that "extraordinary and compelling reasons warrant such a reduction," § 3582(c)(1)(A)(i). The proposed reduction "must be consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). In addition, the district court must "consider[ ] the factors set forth in section 3553(a) to the extent that they are applicable." *Id*.

The relevant policy statement is found in Section 1B1.13 of the Guidelines. *See* U.S.S.G. § 1B1.13(3). Among other things, the Guidelines provide that "rehabilitation of the defendant is

5

not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, app. n.3.

The Guidelines provide that "extraordinary and compelling reasons" based on the defendant's medical condition exist when (i) "[t]he defendant is suffering from a terminal illness;" or (ii) the defendant is suffering from a "serious physical or medical condition," "serious functional or cognitive impairment," or "deteriorating physical or mental health because of the aging process" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A).

Extraordinary and compelling reasons may also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" of note 1. *See* U.S.S.G. § 1B1.13, cmt. n.1(D). Some district courts have concluded that, under the plain language of the Guidelines, only the BOP can make a determination of extraordinary and compelling reasons under this policy statement. *See, e.g.*, *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn*, Cr. No. 89-0072-WS, 2019 WL 3805349, at *3-4 (S.D. Ala. Aug. 13, 2019); *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663 (D. Ariz. June 28, 2019); *United States v. Gross*, No. 2:04-CR-32-RMP, 2019 WL 2437463 (E.D. Wash. June 11, 2019); *United States v. Heromin*, No. 8:11-cr-550-T-33SPF, 2019 WL 2411311 (M.D. Fla. June 7, 2019); *United States v. Willis*, 382 F.Supp.3d 1185 (D.N.M. 2019); *United States v. Shields*, No. 12-cr-00410-BLF-1, 2019 WL 2359231 (N.D. Ca. June 4, 2019). Other courts have concluded that the First Step Act implicitly authorizes the court to make this determination in the place of the BOP,

6

despite the fact that the Commission has not amended the Guidelines to expand the policy statement in this manner. *See, e.g.*, *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994 (S.D.N.Y. Feb. 24, 2020); *United States v. Rivernider*, No. 10 Cr. 222 (RNC), 2020 WL 597393, at *3 (D. Conn. Feb. 7, 2020); *United States v. Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Bucci*, 409 F. Supp. 3d 1 (D. Mass. 2019).

**II.     Sanchez's Motion Should Be Denied**

Sanchez's motion for compassionate release, based on his risk of exposure to COVID-19, should be denied. As explained further below, Sanchez's motion does not demonstrate extraordinary and compelling reasons for a reduction of his sentence to time servedIn addition, the requested reduction to time served is contrary to the sentencing factors under § 3553(a) in light of the seriousness of Sanchez's drug trafficking.

**A.     Sanchez's Risk of COVID-19 Exposure Does Not Warrant a Reduction of Sentence to Time Served**

Sanchez' motion does not show extraordinary and compelling reasons for the requested reduction of his sentence. First, Sanchez's health conditions are real, but are not debilitating and are controlled by the medical care he receives at BOP. Second, Sanchez's risk of exposure to the novel coronavirus at Elkton FCI is being mitigated by BOP. Third, Sanchez would face a significant risk of exposure to the novel coronavirus at his proposed place of home confinement in Bergen County, New Jersey, in the epicenter of the U.S. COVID-19 pandemic.

As an initial matter, Sanchez was tested for COVID-19 on or about May 18, 2020, and tested negative. (Ex. A at 1). According to medical records from the BOP, Sanchez is 56 years old. He is currently assessed by BOP medical staff with type II diabetes,

7

hyperlipidemia (high cholesterol), essential (or primary) hypertension,[2] and obesity. (*Id*. at 3). ▉

▉

According to the Centers for Disease Control, "those at high-risk for severe illness from COVID-19" include people 65 years and older; people living in a nursing home or long-term care facility; and people "with underlying medical conditions, particularly if not well controlled." CDC, *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness* (May 14, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra- precautions/people-at-higher-risk.html. The CDC specifically identifies the relevant underlying medical conditions as (1) asthma, (2) chronic kidney disease being treated with dialysis, (3) chronic lung disease, (4) diabetes, (5) hemoglobin disorders, (6) being immunocompromised, (7) liver disease, (8) serious heart conditions, and (9) severe obesity. CDC, *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness* (May 14, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Among "serious heart conditions," the CDC guidelines identify "heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension." *Id.*

---

[2] Essential hypertension means that the condition has no identified underlying cause. Mayo Clinic, *High blood pressure (hypertension)* (May 12, 2018), *available at* https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410.

8

Sanchez's age, high cholesterol, and hypertension do not place him within the high-risk category under the CDC guidelines. His hypertension is not diagnosed as pulmonary hypertension, which is a type of high blood pressure that specifically affects the arteries in the lungs and the right side of the heart and which causes different symptoms than non-pulmonary hypertension. *See* Mayo Clinic, *Pulmonary hypertension* (Mar. 20, 2020), *available at* https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc- 20350697. Hypertension may well be a risk factor for COVID-19, but is not a "high risk" factor according to the CDC guidelines. Similarly, though Sanchez is assessed with obesity, he is not assessed with severe obesity. ████████ CDC, *Healthy Living Widgets* (Dec. 12, 2019), *available at* https://www.cdc.gov/widgets/healthyliving/index.html. ████████ *See* CDC, Defining Adult Overweight and Obesity (Apr. 3, 2020), *available at* https://www.cdc.gov/obesity/adult/defining.html. Obesity or being overweight may be a risk factor, but it is not a high-risk factor under the CDC guidelines.

Sanchez's diabetes is a health condition that places him in the high-risk category under the CDC guidelines, but Sanchez's diabetes is constantly monitored and treated by BOP. (*Id.* at 6-11). According to the CDC, diabetes puts an individual at higher risk of COVID-19 illness because the individual is more likely to have diabetes-related health problems (such as heart, kidney, and nerve disease), which can make it harder to overcome COVID-19. CDC, *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness* (May 14,

9

2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html; *see also* CDC, *Diabetes: Prevent Complications* (Aug. 1, 2019), *available at* https://www.cdc.gov/diabetes/managing/problems.html. Because Sanchez's diabetes is being monitored and treated, and he does not have related heart or kidney disease (except, as described above, hypertension and high cholesterol which themselves are managed and are not independent high-risk factors under the CDC COVID-19 guidelines), it does not present an extraordinary and compelling reason for a sentence reduction.

Moreover, Sanchez's application should be considered in light of BOP's response to the COVID-19 outbreak at FCI Elkton, as well as the risk of exposure Sanchez would face in the community. FCI Elkton undeniably suffered a significant COVID-19 outbreak, with the virus spreading rapidly through the facility in approximately March and early April 2020. (*See* Declaration of Andrea Burnside dated May 28, 2020 (Ex. B) ¶ 8 (filed in *Wilson v. Williams*, 4:20-CV-00794, Dkt. No. 98-2 (N.D. Ohio))). BOP responded to the outbreak, both before and after the peak, with modified operations to limit inmates' contact with staff and each other; to enhance sanitation, cleaning, and personal protection of staff and inmates; to enhance quarantine and isolation procedures; and to administer COVID-19 tests to all inmates in order to minimize the risk of asymptomatic inmates outside the quarantine or isolation units. As a result, it appears that the spread of the novel coronavirus has been significantly mitigated and, as noted above, Sanchez recently tested negative for the virus.

By way of background:

> Elkton is a low-security prison in Lisbon, Ohio, designed to house approximately 2,000 inmates at the main facility and 500 inmates at the satellite facility. The main facility consists of three buildings with six dormitory-style housing units; each unit holds

10

> approximately 300 inmates split between two sides. The satellite facility has two housing units, each with approximately 250 inmates. Each side of a housing unit contains approximately 150 bunks resulting in two to three inmates sharing a cube and sleeping a few feet away from each other.

*Wilson v. Williams*, --- F.3d ----, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). According to BOP figures, FCI Elkton—the main facility—currently houses 1,897 inmates, and FSL Elkton—the satellite facility—houses 386 inmates, or a total of 2,283 inmates. BOP, *FCI Elkton*, *available at* https://www.bop.gov/locations/institutions/elk/. Also according to BOP figures, FCI Elkton has 438 COVID-19 positive inmates,[3] 7 COVID-19 positive staff members, and has had 9 COVID-19-related inmate deaths. 163 inmates and 46 staff have recovered. *See* BOP, *COVID-19 Resources Page* (May 25, 2020), *available at* https://www.bop.gov/coronavirus/.

In response to the COVID-19 pandemic, the Bureau of Prisons adopted nationwide modified operations. *See generally* BOP, *Implementing Modified Operation*, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp; *Wilson*, 2020 WL 3056217, at *2; *compare United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (noting BOP's "extensive and professional efforts to curtail the [coronavirus]'s spread"). The modified operations, which have been implemented at FCI Elkton, include: the suspension of social and legal visits, inmate facility transfers, staff travel and training, contractor access, and volunteer visits; health

---

[3] This figure appears to reflect the mass testing BOP implemented in May, resulting in the detection of a large number of additional COVID-19-positive inmates. (Burnside Decl. ¶¶ 12, 14-18). In his motion, Sanchez argues that "the rate of infection among inmates has increased by more than six and a half times – from 51 to 332 positive inmates. Despite the increases, even the current numbers are not reliable assessments of the rate of infection, due to the dearth of testing." (Mot. at 3). Sanchez's argument actually is backwards: the number of confirmed positive cases is higher because mass testing identified previously unknown cases, not because the rate of infection is increasing. As discussed below, it appears that the infection rate has decreased.

11

screening of arriving inmates and staff for COVID-19 symptoms and risk factors; steps to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures; expanded screening procedures to mandate use of a screening tool and temperature check, and require asymptomatic arrivals to be placed in quarantine for fourteen days and symptomatic arrivals to be isolated until they test negative for COVID-19 or are cleared by medical staff; and securing inmates to their quarters for a fourteen-day period with limited access to the commissary, laundry, showers, telephone, and other service. *Wilson*, 2020 WL 3056217, at *2; *see also* Declaration of Sandra Dees dated May 8, 2020 (Ex. C) ¶¶ 7-20 (filed in *Wilson v. Williams*, 4:20-CV-00794, Dkt. No. 58-1 (N.D. Ohio)). FCI Elkton has also implemented enhanced screening for inmates on work details (*id*. ¶ 34), restricts inmate orderlies to the unit where they are housed to prevent transmission between units (*id*.), delivers programming directly to the units (*id*. ¶ 50), has inmates collect meals and take them back to the units on staggered schedules (*id*. ¶ 14), and conducts temperature checks and screening of all staff entering the facility. (*Id*. ¶¶ 38-39). Enhanced cleaning and sanitation procedures have been put into place, including cleaning heavily used surfaces like doorknobs, railings, and handles multiple time a day. (*Id*. ¶¶ 65-68). Inmates and staff are required to wear masks at all times. (*Id*. ¶¶ 72, 76). Soap for hand washing is readily available and its use is encouraged. (*Id*. ¶¶ 23, 68-70).

In addition to these significant responses to inhibit the spread of the novel coronavirus and protect inmates from exposure, FCI Elkton also makes appropriate medical care available to any inmate reporting or exhibiting symptoms consistent with COVID-19. Medical staff is available at all times. (*Id*. ¶ 83). Any inmate whose condition indicates that hospitalization is warranted is transported to a local hospital for evaluation and care. (*Id*. ¶ 51). In May 2020, FCI

Elkton implemented mass testing of the inmates in order to test every single inmate and for COVID-19. (Burnside Decl. ¶¶ 12-14). As described above, Sanchez was tested on or about May 18, 2020 and tested negative.

In late March and early April, FCI Elkton experienced a spike in the number of inmates being hospitalized for COVID-19 and the number of inmate deaths. (Burnside Decl. Ex. AA). The spike in hospitalizations ended by approximately mid-April, and it appears that the last time an inmate was hospitalized for COVID-19 was May 4, 2020. (*Id.*). The total number of inmates still in the hospital has declined from nearly 50 in early April to less than 10. (*Id.*; *see also* Burnside Decl. ¶¶ 9-10). The number of confirmed positive inmates and the number of inmates in isolation has jumped significantly (Burnside Decl. Ex. AA), but that appears to be the result of detection through mass testing rather than an increase in the rate of infection. Indeed, the increase in isolation significantly reduces the risk of transmission to the inmates who are not in isolation, including Sanchez.

Sanchez is thus incorrect when he asserts that "the facility[ ] fail[ed] to adequately respond to the pandemic," citing a putative class action filed by certain FCI Elkton inmates pursuant to 28 U.S.C. § 2241. (Mot. at 1). The Supreme Court stayed the district court's injunction in that case, and the Sixth Circuit recently reversed. *See Wilson*, 2020 WL 3056217. While the COVID-19 outbreak at FCI Elkton is serious, BOP's response has been correspondingly serious in its effort to mitigate the risk of exposure. Sanchez recently tested negative for COVID-19, and the drop off in hospitalizations and increased use of isolation indicates that the spread is significantly mitigated. (Burnside Decl. ¶ 9-11).

Moreover, Sanchez's risk of exposure at FCI Elkton must be viewed in comparison to the risk at his proposed place of residence in Bergen County, New Jersey. According to the

13

New Jersey Department of Health ("NJDOH"), Bergen County has the highest number of confirmed COVID-19 cases in the state with 18,667, and the second-highest number of COVID-19-related deaths at 1,635. NJDOH, *New Jersey COVID-19 Dashboard* (June 10, 2020), *available at* https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml. Unlike FCI Elkton, where every inmate has been tested, the availability of community testing for COVID-19 (as has been widely reported) has lagged public health recommendations, and the reported numbers likely understate the actual number of COVID-19 cases by a significant margin. Bergen County also borders Hudson and Essex Counties, which have the second- and third-highest number of cases and the first- and third-highest number of COVID-19-related deaths in the state; and borders New York City and Westchester County, which have by far the highest number of COVID-19 cases and deaths in the country. In other words, Sanchez proposes to live in the epicenter of the United States COVID-19 pandemic.

      Sanchez previously argued that, if released, he would be in the equivalent of home confinement because of state lock-down orders, but New Jersey (like many states) is lifting those restrictions. As of June 9, 2020, New Jersey's statewide stay-at-home order was lifted and the size of permissible public gatherings was increased. State of New Jersey, *COVID-19 Information Hub: When and how is New Jersey lifting restrictions? What does a responsible and strategic restart of New Jersey's economy look like?* (June 5, 2020), *available at* https://covid19.nj.gov/faqs/nj-information/general-public/when-and-how-is-new-jersey-lifting-restrictions-what-does-a-responsible-and-strategic-restart-of-new-jerseys-economy-look-like. Outdoor dining, indoor retail, organized sports, barbershops and hair salons, and swimming pools, among other things, are scheduled to open within the next two weeks. (*Id.*). Additional easing is scheduled for the coming month. (*Id.*). This easing will create the risk of

increasing the rate of community transmission and decrease the likelihood that Sanchez or his proposed household members will adhere to rigorous safety and hygiene protocols. Moreover, there is growing concern among public health officials that the easing of COVID-19 restrictions across the country, as New Jersey is doing, will contribute to a second wave of the pandemic. *See, e.g.*, Audrey Cher, *WHO's chief scientist says there's a 'very real risk' of a second wave of coronavirus as economies reopen*, CNBC (June 9, 2020), *available at* https://www.cnbc.com/2020/06/10/who-says-theres-real-risk-of-second-coronavirus-wave-as-economies-reopen.html; Suzanne Smalley, *Former FDA commissioner sees 'a lot of risk' of 2nd coronavirus wave*, Yahoo! News (June 7, 2020), *available at* https://news.yahoo.com/scott-gottlieb-skullduggery-coronavirus-kavita-patel-protests-235827231.html.

Accordingly, in light of the effective management of Sanchez's medical conditions, the steps BOP has taken to effectively mitigate the spread of the novel coronavirus at FCI Elkton, and the high risk of community transmission in Sanchez's proposed location of residence, his motion does not demonstrate extraordinary and compelling reasons to reduce his sentence to time served.

### B. Sanchez's Request to Reduce His Sentence Is Inconsistent with the Sentencing Factors

Even if the Court were to find that Sanchez's motion demonstrated extraordinary and compelling reasons, the requested reduction would be inconsistent with the sentencing factors in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Lisi*, 15Cr. 457 (KPF), 2020 WL 881994 (S.D.N.Y. Feb. 20, 2020) (denying compassionate release motion where "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served); *United States v. Daugerdas*, 09 Cr. 581 (WHP), 2020

15

WL 2097653, at *4 (S.D.N.Y. May 1, 2020) (same). As in *Lisi* and *Daugerdas*, the sentencing factors "weigh heavily against" reducing Sanchez's sentence to time served.

With respect to the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), Sanchez's offense was very serious. He used his seemingly legitimate trucking company to evade U.S. border and inspection controls against the importation of illegal substances, recruited family members to join his venture, and partnered with armed and dangerous criminals. He played a leadership role within the conspiracy. He trafficked hundreds of kilograms of cocaine and personally profited from the poisonous and corrupting influence of the sale of narcotics on our community, and helped to enrich South American suppliers profiting from American drug dependence. "Drug misuse and abuse continues to endanger too many communities, ruin too many families, and takes the lives of too many of our fellow Americans." Office of National Drug Control Policy, *National Drug Control Strategy*, p. i (Feb. 2020), *available at* https://www.whitehouse.gov/wp- content/uploads/2020/02/2020-NDCS.pdf. "[D]rug trafficking sustains a vast domestic and international criminal enterprise that enables corruption, undermines governance, has a destabilizing effect on our partner nations, and funds a range of illicit activities." *Id*. at 18. "In order to protect their criminal enterprise, drug trafficking organizations also commit violent crimes, threaten and corrupt public officials, traffic weapons, and launder their criminal proceeds." *Id*. at 21.

A reduction of Sanchez' sentence to time served would be contrary to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence. 18 U.S.C. § 3553(a)(2)(A), (B). Indeed, the requested reduction would eliminate more than five years of the sentence imposed. Accordingly, the requested sentence reduction should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Sanchez's motion.

Dated: New York, New York
June 10, 2020

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by:     */s/ Michael D. Lockard*
Michael D. Lockard
Assistant United States Attorney
(212) 637-2193